## LINDA SUE GLAZIER v. STATE OF MARYLAND

[No. 497, September Term, 1975.]

*Decided March 26, 1976.*

648

The cause was argued before POWERS, MENCHINE and DAVIDSON, JJ.

*Harold Buchman, Assigned Public Defender,* for appellant.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Robert D. Horsey, State's Attorney for Somerset County, William B. Yates, II, State's Attorney for Dorchester County,* and *Maurice C. Lewis, Assistant State's Attorney for Dorchester County,* on the brief, for appellee.

MENCHINE, J., delivered the opinion of the Court.

Linda Sue Glazier (appellant) was convicted by a jury in the Circuit Court for Somerset County [1] for the murders of her adoptive father and mother and for armed robbery.

Sentenced to consecutive life terms for the murders and to a consecutive two year term for armed robbery, she raises the following issues on appeal:

1. Applicability of *Miranda* to initial investigative procedures.
2. Voluntariness of confession.
3. Alleged evidentiary errors.

---

[1] Indictments for the offenses had been returned in the Circuit Court for Dorchester County. The cases were removed, on suggestion of the appellant, to the Circuit Court for Somerset County.

4. Alleged absence of intelligent waiver of right to testify.
5. Sufficiency of the evidence

   (a) Murder
   (b) Robbery.

6. Alleged instructional errors.

## 1. Applicability of *Miranda*

Raymond W. Davis, for 10 years an employee of William Glazier, lived about 300 yards from the Glazier home on Ross Neck Road in Dorchester County, Maryland. At about 7 a.m. on September 23, 1974 Davis went to the Glazier garage. He noted that the Glaziers' Mercedes automobile was not within it. He heard the Glazier dog barking incessantly. Looking through a window, he saw disarray within the dwelling. When Davis opened the utility room door, he saw things scattered all over the floor, including a CB unit lying in the doorway. As he entered the kitchen he noticed that the drawers were pulled out and their contents scattered.

Proceeding through the living room and hall, Davis ultimately opened the master bedroom door. A dead body was in the bed, ultimately identified as Dorothy Glazier. Unable at first to identify the body, Davis had called the sheriff's office and the sister of Mrs. Glazier, being under the impression that the Glaziers had gone to visit the sister over the weekend. A deputy sheriff, answering Davis's call, arrived at the home at 7:42 a.m. and found the dead body of William Glazier lying on the floor on the other side of the bed. The Glaziers had been killed by shotgun fire. The deputy then called Sheriff Johnson who arrived at the home at 7:55 a.m.

State Police were alerted and Trooper Wade Roche, a criminal investigator, arrived at the scene at 8:32. Linda Sue Glazier, (appellant) adopted daughter of the Glaziers, was believed to be in attendance at college. Unsuccessful attempts were made to reach her there. The first police

contact with Linda Sue Glazier was initiated by her and was thus described by the sheriff:

"Did you receive any call or anything at that time?

A   Yes, sir.

Q   Will you tell us about it, please?

A   At approximately 20 minutes after 10:00, this is in the a.m., the telephone rang and I answered the telephone. And a young lady's voice at the other end asked to whom she was talking and I identified myself. I said, 'This is Sheriff Johnson.'

She said, 'This is Linda Sue Glazier, and I want to know what in the hell is going on down at my mother's and father's.'

I said, 'Where are you?'

She said, 'I'm at Dickie Greenwell's trailer at Airey's.'

And she said, 'I demand to know what in the hell is going on at my mother's and father's.'

I said, 'Linda Sue, if you will, stay where you are. I will send a deputy to explain to you as to what happened. There has been an accident.' "

A deputy sheriff was dispatched to the trailer and the appellant was taken to an office of the State Police in Cambridge, Maryland. Trooper Roche met her there at 11 a.m. It is conceded that *Miranda* warnings were not given to the appellant at that time.

When the presentation of evidence at the trial had developed the circumstances heretofore outlined, proceedings before the jury were suspended. Testimony by Trooper Roche; by Sergeant Martin Joseph Keating, in charge of criminal investigation Barrack "I" Easton, Maryland; and by Linda Sue Glazier, was taken out of the presence of the jury. The testimony dealt with incidents occurring during two separate time periods, namely: (a)

between 11 a.m. and 12:15 p.m. and (b) after 1:17 p.m. on September 23, 1974.

The appellant contends that the initial interview with the appellant was in violation of the strictures of *Miranda* and "so tainted the subsequent proceedings as to invalidate her waiver of her privilege against self-incrimination." Additionally, she contends "that under the totality of the circumstances, her confession was the involuntary product of unconstitutional pressures applied both before and after her purported waiver of her *Miranda* rights, and therefore should not have been admitted."

The State's position is that *Miranda* was not applicable to the initial interview occurring between 11 a.m. and 12:15 p.m. The State maintains also that a confession by the appellant made after *Miranda* warnings had been given her was her free, voluntary and unconstrained act.

The threshold question as to when the point is reached in police investigations that *Miranda* warnings are mandated was the subject of discussion in depth in the case of *Cummings v. State*, 27 Md. App. 361 (1975). We pointed out that where the interrogation was non-custodial in nature, *Miranda* is inapplicable and compliance therewith is moot (at page 369).

At the conclusion of the preliminary hearing out of the presence of the jury the trial judge ruled that:

> "As far as I'm concerned, there was no in custody investigation taking place until after the Miranda warnings were given.
>
> "Now, she may, I guess, argue maybe she was in police custody from the time she was put in the automobile. But according to her testimony, I don't think she was.
>
> "The officers put her in the car, took her in town, and carried her to the police station.
>
> "And the police officer testified it was a general discussion trying to find something to help him with the investigation. That's about what it

amounted to, so I don't think there was in custody investigation until later on in the day.

"When he found out she was a suspect, which was shortly after lunch, 1 o'clock, then he gave her the necessary constitutional warnings and she said she understood them."

In our constitutionally mandated independent review of the record as a whole, we find that the initial interview between 11 a.m. and 12:15 p.m. did not constitute a custodial interrogation and thus is not within the purview of *Miranda*.

We deem the undisputed fact that the appellant initiated that police interview to be of considerable importance in our review of the record. It is true that the interview was carried on in the office of the Maryland State Police. The choice of that site under the circumstances of this case, however, certainly was not inappropriate. The shocking conditions extant at the home of the appellant ruled out its choice as a site for the police to respond to her inquiry. The trailer home of another person, from which she telephoned, was inappropriate also. Her interest, as it then appeared to police authorities, was to seek information concerning the tragedy and to assist in the apprehension of the perpetrators of the crime. The ensuing interview took place between the hours of 11 a.m. and 12:15 p.m. Roche summarized the general nature of the discussions between himself and the appellant between 11 a.m. and 12:15 p.m. as follows:

"The first time I spoke with her, Your Honor, was simply talking to her as a member of the family.

"She was not under suspicion at that point. I talked to her as I would talk to any members of the family trying to gather information that would lead to a successful conclusion of the crime.

"The questions were strictly investigative, such as, 'Who would have a reason to want to harm your parents?' and things of that nature.

"We interviewed Linda. Like I said, I was asking her questions as to who might have had the motive

to do harm to her parents, and talked to Linda just as I would any member of the family, just as we had Mr. Davis and other people that we had interviewed, neighbors, and asked them questions as to movements and things like that."

He added that, "We talked about many things, the fact that she went — attended the same school that I had gone to, and talked about how things were at Goldey Beacom [College], and things other than investigative questions were talked about. It was more of a conversation."

During the course of the interview a friend of the appellant "came in and asked if he could speak to Linda, and came in and told her, of course, he was sorry what happened and she was free to come and stay with him as soon as we were done talking to her."

Trooper Roche thus declared his position when he arrived at the State Police office:

"Q You say when you arrived there that she was not in custody? Are you saying that?

A Right. I didn't feel as though she were in custody.

Q She was free to go?

A There was no way I could legally held her or I would not have tried to hold her there at that point. No sir, I would not have."

It is true that the appellant testified that, "I figured I was in custody of them." She had previously said, however, that she "had a phone call telling me that the Glaziers were dead, that it had been heard over the radio and I called down there and the Sheriff said he would send somebody to get me and they would meet me when [they] got me to the police barracks." She admitted that the subject whether she could leave during the initial interview wasn't "ever brought up by anybody."

We are persuaded, as was the trial judge, that viewing the issue of custody — as applied to the period between 11 a.m. and 12:15 p.m. — from the state of mind of a reasonable

person in the appellant's circumstances, the appellant was not in custody. *Miranda* had no application to that period of time. *Cummings, supra*, at 381.

Moreover, there is no evidence (a) that any information emanating from the appellant during the course of the initial interview played the slightest role in the discovery of the damning evidence uncovered by other officers in their investigation being contemporaneously conducted, or (b) that any information elicited in that initial interview had influenced or affected her subsequent confession. There was in short, no showing of prior taint or that the later confession was in any respect the result of the prior interview.

## 2. Voluntariness of Confession

We find no merit in the secondary contention of appellant that the confession later made by the appellant was involuntary.

At 12:15 p.m. Trooper Roche had left the State Police office for the sheriff's office, to which other investigating officers had returned. There he learned — for the first time — "that [Deputy Roe] had found [at the Greenwell trailer] this shotgun, the shell casing, and the bloodstained napkins, what we took to be bloodstained napkins, and towel."

She was subjected to no interrogation of any kind between 12:15 p.m. and 1:17 p.m. when the *Miranda* warnings were given.

After receiving that information from Roe, Trooper Roche returned to the State Police office at 1:17 p.m. and "advised [appellant] that she was now a suspect for the double homicide of her parents and at that time I give [sic] her the Miranda warnings."

The appellant conceded that no one had threatened, beaten or intimidated her. The sole basis for her contention that her confession was coerced arises from her testimony that, "[Detective Sergeant Keating] had said that if I gave a statement voluntarily, that it might be easier on me in court." She added that, "I thought that if they found out any

information that could implicate me, it would be lesser charge."

Keating denied making such a statement. Trooper Roche denied that any promises or inducements were made.

The trial judge thus pinpointed the credibility issue on this conflicting testimony:

> "Now, you say sometime during that afternoon in the presence of Trooper Keating and Mr. Roche, you were told that it may go easier on you if you made a statement.
>
> Is that about the size of it?

THE WITNESS: Yes, sir.

THE COURT: Which one of them told you that?

THE WITNESS: Sergeant Keating.

THE COURT: Sergeant Keating.

> What time did he tell you that?

THE WITNESS: It was around 4:00 or 4:30, something like that.

THE COURT: Was Trooper Roche present when that was said?

THE WITNESS: I think he was not, but I'm not sure.

THE COURT: Did you hear him testify nothing like that was mentioned?

THE WITNESS: I heard him.

THE COURT: Did you hear Sergeant Keating testify nothing like that was mentioned?

THE WITNESS: That is right.

THE COURT: Both lying?

THE WITNESS: Yes, sir."

The trial judge credited the testimony of Keating; he rejected the testimony of the appellant. We accept this

first-level fact as found by the trial judge. *Walker v. State,* 12 Md. App. 684, 695 (1971). We find as an ultimate constitutional fact after examination of the record as a whole that the confession of the appellant was voluntary and admissible in evidence.

### 3. Alleged Evidentiary Errors

(a) Admission of witness's contemporary notes as exhibit

It probably can be said that in earlier times the weight of authority broadly was to the effect that his own contemporary notes, when used by a witness to refresh his recollection, were inadmissible as documentary evidence, except at the instance of the adverse party. That there is a clear trend to the contrary is shown in 3 Wigmore, Evidence § 754 (Chadbourn rev. 1970) where it is pointed out that "* * * in both the last and present century, much criticism of this doctrine has been voiced, and to a significant extent (the precise limits of which are difficult to determine) the advocates of forthrightly admitting the record as documentary evidence have gained ground."

A classic example of this changing view is to be found in *Fisher v. Swartz,* 130 N.E.2d 575 (Mass. 1955), wherein a witness had read, without objection, a memorandum earlier prepared by him. The memorandum later was received in evidence over objection. The Supreme Judicial Court of Massachusetts, sustaining the propriety of its admission, rejected its earlier decision to the contrary, saying at 577, *et seq.*

> "The defendant does not argue that the statement was not a record of past recollection. His position in substance is that it is not admissible in any event, and he relies on Bendett v. Bendett, 315 Mass. 59, 52 N.E.2d 2, cited above. That that case sustains the defendant's contention cannot be gainsaid. There the plaintiff while testifying had used a diary kept in the usual course of business to 'refresh his recollection.' It is not clear from the opinion — and an inspection of the original papers

furnishes no additional light — whether the memorandum revived a present memory or was a record of past recollection. The opinion dealt with the question on the basis that it might have been the latter. So treated, the court said that it saw 'no reason for denying to the trial judge discretion to permit a witness to incorporate in his testimony a writing expressive of his past knowledge, and to read it and even to show it to the jury.' 315 Mass. at page 64, 52 N.E.2d at page 6. But, as the court pointed out, the judge went further and admitted the writing as independent evidence and not as a part of the testimony of the plaintiff. This was held to be error. The court recognized that in some jurisdictions, 'because of the slight practical difference between the incorporation of a writing in the testimony of a witness and the admission of the writing as evidence by itself, a written record of the past knowledge of a witness is held admissible in evidence.' 315 Mass. at page 64, 52 N.E.2d at page 6. The court, nevertheless, was of opinion that 'such a writing under some circumstances might have some inherent evidential weight independently of its adoption by the witness as the expression and embodiment of his testimony. In such a case, neither party would be entitled to have that weight thrown into the scale, on the merits of the case, unless the writing should be admissible on some other ground.' 315 Mass. at page 65, 52 N.E.2d at page 6.

"In view of the importance of this question in the trial of causes we are disposed to reconsider it. Further study of the question has convinced us that both reason and authority lead to the conclusion that the writing ought to be admissible as evidence. It is to be noted that in the Bendett case a majority of the court was of the opinion that, although it was error to permit the memorandum to be put in evidence, the error, nevertheless, was harmless.

The reason was that the witness had testified with respect to the items contained in the memorandum and had been cross-examined about them. 'Thus,' said the court, 'the jury had been made familiar with everything material that was contained in the book. The admission of the book in evidence merely put before their eyes what they knew already. So far as appears there was nothing in the sight of the items in the book that was more convincing than the testimony of the plaintiff that they were the items in an account that he knew to be true. We do not see how the defendant was harmed.' 315 Mass. at page 65, 52 N.E.2d at page 6. But that would be the case in most if not all situations where a memorandum of past recollection was put in evidence. Prior to its admission the witness would usually have read to the court or jury the contents of the memorandum, and its admission as evidence, since it would have added little or nothing, would generally be treated as harmless error. We prefer a less squeamish approach to the question. Rather than to say the admission of the writing is error, but error that does no harm, we think that it is better to say that there is no error at all.

"This is the prevailing view elsewhere and is favored by distinguished scholars in the field of evidence. * * *"

Although the precise issue was not presented in *Hall v. State*, 223 Md. 158 (1960), the language used by the Court of Appeals at page 173 offers clear assurance that it shares the current Massachusetts view:

"Where, as here, the past recollection recorded is vouched for as to accuracy by the person who made the record and it has been made at the time of the statement, *Wigmore strongly favors its admissibility. He is firmly opposed to the qualification added by some courts to the effect that it is admissible only if the witness has no*

*present recollection.* See § 738, where he says: 'A faithful memorandum is acceptable, not conditionally on a total or partial absence of a present remnant of actual recollection in the particular witness, but unconditionally; because for every moment of time which elapses between the act of recording and the occasion of testifying, the actual recollection must be inferior in vividness to the recollection perpetuated in the record.' *It is Wigmore's view (§ 754) that after the witness has testified from the record, the record itself is admissible in evidence.*

"Perhaps the leading case on the subject is *Kinsey v. Arizona, supra,* in which, 125 A. L. R. at pp. 13-14, the Supreme Court of Arizona said: 'Regardless of the weight of the authority on the question, it seems to us that upon every principle of logic and common sense, evidence of this class should be admissible. It is an undisputed and undisputable fact the human memory weakens with the passage of time, more with some individuals, less with others, but to some extent with all, and that a written record, unless changed by extrinsic forces, remains the same for all time. It would seem, then, that such a record made contemporaneously with the event by a witness who was honest and capable of observing accurately what happened, would be far better proof of the true facts than the present recollection of that same witness six months later, whether unrefreshed or refreshed by some extrinsic aid, but still in the last resort presumably independent in its nature. There are but two objections to the use of such evidence which have been seriously urged. The first is that it is hearsay in its nature, and the second, that the witness who vouches for the record cannot be properly cross-examined. We think both of these objections are without foundation. The recorded memory of the witness is just as much the

statement of that witness as to what he personally saw or heard as is his present independent recollection of the same fact. * * * But when the person who witnessed the event testifies to the accuracy of the memorandum as made, that memorandum is just as much direct and not hearsay evidence as the language of the witness when he testifies to his independent recollection of what he saw. The objection in regard to cross-examination, on its face, might seem to have some weight, but we think a careful analysis of the question will show that it also is unfounded. What is the purpose of cross-examination? Obviously it is to convince the triers of fact, in some manner, that the testimony of the witness is untrue, for if the cross-examiner accepts it as true, there will be no need nor desire for cross-examination. How, then, may the truthfulness of the evidence of a witness be attacked through cross-examination? It seems to us that all attacks thereon must be reduced to one of three classes: (a) Upon the honesty and integrity of the witness; (b) upon his ability to observe accurately at the time the incident occurred; and (c) upon his accuracy of recollection of the past events. When a witness testifies as to his present recollection, independent or revived, he may, of course, be cross-examined fully on all three of these points. When he testifies as to his past recollection recorded, he can be examined to the same extent and in the same manner as to the first and second of these matters. He cannot well be cross-examined on the third point, but this is unnecessary, for he has already stated that he has *no* independent recollection of the event, which is all that could be brought out by the most rigid cross-examination on this point when the witness testifies from his present recollection, independent or revived.'

"The arguments of Professor Wigmore and of the Supreme Court of Arizona as to the reliability of

past recollection accurately and promptly recorded are convincing to us. * * *" (Emphasis added.)

*Wilson v. State,* 20 Md. App. 318 (1974) is readily distinguishable. In *Wilson* the documents admitted in evidence had not previously been read into evidence verbatim by the witnesses.

We see no error.

(b) Admission of court stenographer's transcript of confession of accused

Here the appellant makes the additional contention that: "The trial court erred in admitting the transcription of the second statement in the absence of authentication by the court reporter."

The record shows that the witness Roche was present when the statement of the appellant was recorded by the Court Reporter of Dorchester County and certified to its accuracy. This was a sufficient authentication. *See:* 3 Wigmore, *supra,* §§ 737, 748, 749 and 760.

*See also, Hall v. State, supra,* where in a dictum the Court of Appeals said at 177:

"We think there was no error in permitting Detective Davis virtually to read his notes in evidence or in permitting Mr. Perkins to read from his stenographic notes. Indeed, we think the trial court might well have admitted Detective Davis' original notes and Mr. Perkins' original notes and a correct transcription thereof into evidence as documents."

### 4. Alleged Absence of Intelligent Waiver of a Right to Testify

Appellant was represented by experienced trial counsel. The issue is frivolous. In *State v. McKenzie,* 17 Md. App. 563 (1973), we said at 582-83:

"Where, * * * a defendant is represented by counsel, there is no duty on the part of the trial court to offer the accused any advice on his election

to testify or not to testify or to explain the ramifications of either choice. The Court of Appeals said in *Stevens*, [232 Md. 33, U. S. cert. den., 375 U. S. 886] at 39:

'[W]e do not deem it essential for the protection of a defendant's constitutional rights that he be advised by the court of his right against self-incrimination when he is represented by counsel . . . . Here, the appellant was called to the stand by his counsel and in such a case there is no requirement that the court advise him of his right to refuse to testify.' "

## 5. Sufficiency of the Evidence

(a) Murder

The issue is frivolous. There was abundant evidence that the appellant was a willing participant in the premeditated murder of both of her parents.

(b) Robbery

There was evidence from which a rational inference could be drawn that the wallet and pocketbook of Dorothy Glazier had been the subject of a forcible trespassory taking and asportation. There was also evidence from which a rational inference could be drawn that other items, scattered about the premises, were abandoned in the course of hasty departure. *Wiggins v. State*, 8 Md. App. 598, 603 (1970). The appellant was in no event less culpable than as principal in the second degree. *Butina v. State*, 4 Md. App. 312, 318 (1968).

## 6. Alleged Instructional Errors

(a) Felony murder instruction

There having been legally sufficient evidence tending to show that the murders occurred in the perpetration of a robbery, the instruction was proper. Code Article 27, § 410.

(b) Burden of proof instruction

The trial judge included in his advisory instruction the charge, given from time immemorial, that a burden rested

upon the defendant to lower the degree of guilt from second degree murder to manslaughter. Appellant, relying upon *Mullaney v. Wilbur*, 95 S. Ct. 1881 (1975), contends that the instruction was erroneous in its light. This is not disputed. The State contends, however, that in the circumstances of this case, the error was harmless beyond a reasonable doubt and does not require reversal. We agree.

The appellant in the subject case was convicted of murder in the first degree. There was not a scintilla of evidence of mitigation or justification. In *Brown v. State*, 29 Md. App. 1, 19-20 (1975), we said:

> "In such situations an erroneous instruction relative to a presumption of second degree murder arising *ipso facto* from a bare showing by the State of homicide is cured by the verdict of murder in the first degree because it is clear that the State has met its ultimate burden and proved that the crime was committed with wilful, deliberate and premeditated malice, the essential ingredients of first degree murder. By so proving to the satisfaction of the trier of fact, at a jury or a non-jury trial, the State has disproved second degree murder. Similarly, an erroneous instruction concerning an accused's burden of lowering the offense from second degree murder to manslaughter is likewise cured because the State has negated to the satisfaction of the trier of fact, any mitigation. The net result, in such cases, of incorrect instruction where mitigation or 'hot blood' is not an issue fairly in the case, is that the instruction, at worst, is harmless beyond a reasonable doubt under *Harrington v. California*, 395 U. S. 250, 254, 89 S. Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California*, 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967), and, at best, a gratuity given for the benefit of the accused and to which he was not entitled."

We find no reversible error.

*Judgments affirmed.*