## JAMES OTTIE GREENWELL v. STATE OF MARYLAND

[No. 1010, September Term, 1975.]

*Decided September 14, 1976.*

The cause was argued before MORTON, POWERS and GILBERT, JJ.

*Geraldine Kenney Sweeney* and *Leonard C. Redmond,*
*Assistant Public Defenders,* with whom were *Alan H.*
*Murrell, Public Defender,* and *Edward J. Angeletti,*
*Assistant Public Defender,* on the brief, for appellant.

*Bruce C. Spizler, Assistant Attorney General,* with whom
were *Francis B. Burch, Attorney General, William D. Yates,*
*State's Attorney for Kent County,* and *Maurice Lewis,*
*Assistant State's Attorney for Kent County,* on the brief, for
appellee.

POWERS, J., delivered the opinion of the Court.

James Ottie Greenwell, indicted in Dorchester County on two charges of murder, was tried in Kent County before a jury and Judge Harry P. Clark. From his convictions of first degree murder in each case, and sentences to two consecutive terms of life imprisonment, he took this appeal.

Only one question is raised in this Court. It is stated in appellant's brief in these words:

> "Did the trial judge err in overruling the motion to suppress incriminating statements made by Appellant during custodial interrogation conducted before Appellant obtained counsel, where persuasive evidence showed that Appellant had a learning disability which substantially affected his capacity to make a knowing and intelligent waiver of his constitutional rights?"

The bodies of William Glazier and his wife, Dorothy Glazier, were discovered in the bedroom of their home in Dorchester County at about 7:00 A.M. on 23 September 1974. Each had been killed, probably two days earlier, by shotgun fire.[1] The indictments against appellant charged that he murdered the two victims. The cases were removed to Somerset County, and from there were removed to Kent County for trial. The trial began on 14 July and was concluded on 19 July 1975.

Appellant moved to suppress oral statements made by him while he was in custody. The motion was heard separately, out of the presence of the jury, during the course of the trial. The transcript of the separate hearing covers about 370 pages, and records the testimony of five police officers, a psychiatrist, and Greenwell's employer, all called by the State, and of a clinical psychologist, called by the appellant. Judge Clark's ruling that the statements were admissible in evidence is the basis of the only issue before us in this appeal.

---

1. For a more detailed statement of the facts as they appeared in evidence at the separate trial of Linda Sue Glazier, adopted daughter of Mr. and Mrs. Glazier, see the opinion of this Court in Glazier v. State, 30 Md. App. 647, 353 A. 2d 674 (1976), *cert. denied,* Court of Appeals, 23 June 1976.

Evidence at the suppression hearing showed that at noon on 23 September 1974 State Trooper Ralph Lewis, at the request of another officer, located Greenwell at Cordova, in Talbot County, and asked Greenwell to come with him to the Dorchester County Sheriff's office at Cambridge. At the Sheriff's office Greenwell was questioned, at about 1:00 P.M., by Detective Sgt. Joseph Keating of the State Police, and by Thomas Roe, an investigator for the Sheriff's office. He made what they described as an oral statement.

From Cambridge Greenwell was taken to Salisbury by Roe and Corporal Donald Cox, of the State Police. At Salisbury Greenwell was given a polygraph test by State Police Corporal Charles Griffith, after which he made an oral statement to Griffith, Cox, and Roe. Back at Cambridge, at about 6:00 P.M. on the same day, Greenwell made a third oral statement to Roe and Cox, in the presence of a court reporter, who recorded and transcribed what was said. Two days later, on 25 September 1974, Greenwell made a fourth oral statement, this time at the State Police office in Cambridge, in the presence of Roe and Cox.

According to the undisputed evidence, before any interrogation was begun on each of the four occasions, an officer read each of the so-called "Miranda warnings" to Greenwell, and he responded that he understood. On two of the occasions he signed a waiver on the paper on which the "warnings" were printed. Also undisputed was the evidence that the statements were not induced by any force, threats, or promises, and that each of the statements was entirely voluntary.

A fundamental responsibility of our system of criminal justice is to provide a means by which both society and a person accused of crime may participate together in the search for truth, within a framework of rules of law and procedure designed to assure fairness to both.

When a crime is known to have been committed, it becomes not only the right, but the duty of law enforcement officers to investigate — to search for facts — to search for the truth — to the end that the person who committed the crime may be dealt with as justice requires. An officer may

seek information wherever it can be found. He may, indeed, ask the very person he suspects of guilt, "Did you commit this crime?" If the person suspected is later charged and brought to trial, his response may be offered in evidence against him at the trial.

Two different constitutional principles may bear, simultaneously, or independently of each other, on the question of admissibility of that evidence. One is that it must be shown that the statement was not induced by force, threats, or promises, but was made freely and voluntarily. The other is that when the statement stems from a custodial interrogation, it must be shown that the accused knew and understood that he had a constitutional right not to be compelled to be a witness against himself, and that he voluntarily, knowingly, and intelligently waived his rights.

The requirement that the statement be made voluntarily is of long standing. It was expressed by the Court of Appeals in *Nicholson v. State*, 38 Md. 140 (1873), when it said, at 153:

> "Without undertaking to lay down any general rule on this subject, or attempting to define the nature and character of the inducements held out to a prisoner, which would render his confession inadmissible; for this must necessarily depend very much upon the particular circumstances of each case; it is very clear upon all the authorities, that if the confession of the appellant had been induced by any threat of harm, or promise of worldly advantage held out to him by Crone, or by his authority, or in his presence and with his sanction, it ought to be excluded.
>
> "The law is also well settled that the *onus* is upon the prosecutor, to show affirmatively, that the confession proposed to be offered was not made in consequence of an improper inducement. 1 Taylor, sec. 796. In the language of Baron Parke in *Reg. v. Warringham*, 2 Den. C. C. 448, note, *the court must be satisfied* that the confession sought to be used in evidence against the prisoner, 'was not obtained from him by improper means.' "

The rule has continued to be applied in Maryland. In *Smith v. State*, 189 Md. 596, 56 A. 2d 818 (1948), the Court of Appeals said, at 603-04:

> "Before a confession can be admitted in evidence, the State must show, to the satisfaction of the court, that it was the free and voluntary act of an accused; that no force or coercion was exercised by the officers obtaining the confession, to cause the accused to confess; that no hope or promise was held out to an accused for the purpose of inducing him to confess."

Involved in the reasoning of some of the earlier cases and writers was the likelihood that a forced confession may be untrustworthy. The Supreme Court of the United States rests the rule squarely upon the due process clause of the Fourteenth Amendment. Mr. Justice Frankfurter said for the Court in *Rogers v. Richmond*, 365 U. S. 534, 81 S. Ct. 735, 5 L.Ed.2d 760 (1961), at 540-41:

> "Our decisions under that Amendment have made clear that convictions following the admission into evidence of confessions which are involuntary, *i.e.*, the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system — a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth. See *Chambers v. Florida*, 309 U. S. 227; *Lisenba v. California*, 314 U. S. 219, 236; *Rochin v. California*, 342 U. S. 165, 172-174; *Spano v. New York*, 360 U. S. 315, 320-321; *Blackburn v. Alabama*, 361 U. S. 199, 206-207. And see *Watts v. Indiana*, 338 U. S. 49, 54-55. To be sure, confessions

cruelly extorted may be and have been, to an unascertained extent, found to be untrustworthy. But the constitutional principle of excluding confessions that are not voluntary does not rest on this consideration. Indeed, in many of the cases in which the command of the Due Process Clause has compelled us to reverse state convictions involving the use of confessions obtained by impermissible methods, independent corroborating evidence left little doubt of the truth of what the defendant had confessed. Despite such verification, confessions were found to be the product of constitutionally impermissible methods in their inducement. Since a defendant had been subjected to pressures to which, under our accusatorial system, an accused should not be subjected, we were constrained to find that the procedures leading to his conviction had failed to afford him that due process of law which the Fourteenth Amendment guarantees."

The Supreme Court said further, at 544-45:

"The attention of the trial judge should have been focused, for purposes of the Federal Constitution, on the question whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined — a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth. The employment instead, by the trial judge and the Supreme Court of Errors [of Connecticut], of a standard infected by the inclusion of references to probable reliability resulted in a constitutionally invalid conviction, pursuant to which Rogers is now detained 'in violation of the Constitution.' A defendant has the right to be tried according to the substantive and procedural due process requirements of the Fourteenth Amendment. This means that a vital confession, such as is involved in

this case, may go to the jury only if it is subjected to screening in accordance with correct constitutional standards. To the extent that in the trial of Rogers evidence was allowed to go to the jury on the basis of standards that departed from constitutional requirements, to that extent he was unconstitutionally tried and the conviction was vitiated by error of constitutional dimension."

Citing *Rogers v. Richmond, supra,* the Supreme Court reiterated the rule in *Jackson v. Denno,* 378 U. S. 368, 84 S. Ct. 1774, 12 L.Ed.2d 908 (1964), when it said, at 376:

"It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, *Rogers v. Richmond,* 365 U. S. 534, and even though there is ample evidence aside from the confession to support the conviction. *Malinski v. New York,* 324 U. S. 401; *Stroble v. California,* 343 U. S. 181; *Payne v. Arkansas,* 356 U. S. 560. Equally clear is the defendant's constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession. * * * ."

The right of a person not to be compelled to be a witness against himself in a criminal case is protected by the Fifth Amendment to the Federal Constitution and by Article 22 of the Declaration of Rights of the Constitution of Maryland. It was not, however, until the opinion of the Supreme Court in *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), that there was established and spelled out a series of procedural safeguards effective to assure that an individual subjected to custodial police interrogation is accorded his privilege under the Fifth Amendment against self-incrimination. *Miranda* did not hold that a statement

may not be taken from a person in the course of custodial interrogation. Indeed, it laid down the rule that after having been advised of them,

> "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." Id. at 444.

In its further discussion of the cases then before it, the Court said, at 457:

> "In these cases, we might not find the defendants' statements to have been involuntary in traditional terms. Our concern for adequate safeguards to protect precious Fifth Amendment rights is, of course, not lessened in the slightest."

We have indulged in the preceding discussion so that, by pointing out what is not under attack, we may focus upon what is under attack. We may take it as conceded that the statements made by the appellant were voluntary, in traditional terms. Likewise, it is not in issue here that the police demonstrated the use of procedural safeguards considered in *Miranda* to be effective to secure the privilege against self-incrimination, nor is it in issue that prior to any questioning on each of the four occasions of custodial interrogation, the police warned the appellant of his rights by reading them to him and by receiving his answer, as to each one, that he understood it. Each time, the warnings of his rights were followed by Greenwell's expressed waiver of those rights, confirmed twice by his writing. There is no suggestion that the police did or said anything for the purpose of overbearing Greenwell's will. In no way are the actions of the police in this case impugned.

Greenwell confessed that he committed the murders, and his confessions were voluntary. Before the questioning which preceded his confessions, the police told him of his basic right to remain silent, and of the other rights, such as the right to counsel, designed to effectuate that basic right. Appellant said that he understood those rights, and that he waived them.

We must determine, as did the court below, whether those waivers were voluntary. In the ordinary sense of the word voluntary, there can be no doubt. The waivers were not coerced or induced. When Mr. Chief Justice Warren said for the Supreme Court in *Miranda* that a waiver of the right must be made "voluntarily, knowingly and intelligently", the Court did not mean, we take it, that the waiver must stand up under three different tests. We understand the words "knowingly and intelligently" to have been used to put a gloss on the word "voluntarily", so that for the purpose of a waiver it carries with it a connotation that the volunteer is aware that he may not be compelled to incriminate himself, but has still decided to talk. It is the fact of his decision, not the wisdom of it, for which we look. Surely the word intelligently could not have been intended to mean wisely, for who is to judge, restrospectively, the ethical wisdom of telling the truth, even when it hurts.

We turn to the evidence at the suppression hearing which bore on the question of whether appellant knew what he was doing when he waived his rights and confessed. The question involves a constitutional right, so in our appellate review of the lower court's ruling on admissibility of the statements, we make our own independent, reflective, constitutional judgment on the facts. *Walker v. State,* 12 Md. App. 684, 695, 280 A. 2d 260 (1971). To make the judgment that the statements were admissible, we must be persuaded, and find, by a preponderance of the evidence on the issue, *Mulligan v. State,* 18 Md. App. 588, 597-602, 308 A. 2d 418 (1973), that the appellant voluntarily, knowingly and intelligently waived effectuation of the safeguards designed to secure his privilege against compelled self-incrimination.

We find as a fact from the evidence that the appellant did make such a waiver, so that the statements he made to the police were properly admitted in evidence at his trial on the issue of guilt.

Deputy Sheriff Roe, the only police officer who was present at all four interrogations, had known the appellant for eight or nine years, and called him by his first name. Roe knew that the appellant had formerly worked for Barnes

Electric, and at the time was a good employee of Stanley Taylor, of Taylor Electric. He said that appellant wires houses, wires electric panels, installs lights, takes care of service calls, and repairs electrical malfunctions. Apparently Roe himself did some electrical work on a part time basis, and saw and talked to appellant on jobs where he was working. Roe also said that he had conversations with appellant at times, and that appellant talked mainly about hunting, and was a hunting enthusiast. Roe said that he did not know anything about appellant's educational background, or his reading or writing ability, but that he appeared to understand the English language.

Corporal Griffith, who gave appellant the polygraph, related in detail the preliminary conversations they had. He said that "Mr. Greenwell signed his name and carried on a perfectly good conversation and gave no indication at all that he could not read or write."

Stanley Taylor, his employer, said that Greenwell "could do good work, but I would have to lay it out", and that appellant required more instruction and supervision than the usual helper.

Expert opinion evidence was presented to the court by two witnesses. They were Dr. Ido Adamo, a psychiatrist and Acting Clinical Director of Clifton T. Perkins Hospital, where Greenwell had been examined and evaluated, and Dr. Dennis Harrison, a clinical psychologist, who testified that he had examined appellant for the specific purpose of evaluating his ability to understand the Miranda rights. Both classified Greenwell in the dull normal range on intelligence tests, and as functionally illiterate.

We see no purpose to be served by reciting in detail the various tests and other factors developed and considered by each of the experts which led each of them to the conclusion he expressed. So far as we are able to judge, each of the expert witnesses demonstrated a sound basis, in terms of the teachings of his professional discipline, for his conclusion.

Dr. Adamo, in the light of the overall staff evaluation at Perkins, found no evidence of a disorder which would have

prevented Greenwell from understanding the Miranda warnings. He expressed his opinion: "He had the capacity to understand the Miranda warnings."

Dr. Harrison found in the appellant ample evidence of a specific learning disability in the auditory and verbal processes. In his tests of understanding of various words and phrases, Dr. Harrison included some taken from the Miranda warnings. Some of his responses were considered acceptable, some were not. We think it is significant that to one of the most basic, the right to remain silent, the appellant responded, "You can keep your mouth shut." Referring to a response which was acceptable, Dr. Harrison said, "that really didn't dissolve the doubts I had in my mind at that point." We think his conclusion reflected those doubts. He said: "I think he can understand some of the phrases, and I have reasonable doubt he could understand it fully and intelligently."

Precise evaluation of the mental processes of another approaches the impossible. Even with the aid of trained and competent professionals, it is a difficult task. When necessity requires a decision, we must do the best we can. The opinions of the two experts in this case tend to lead to different conclusions. Both cannot be correct. We are convinced that the evidence, taken as a whole, preponderated in favor of the admissibility of the appellant's statements.

*Judgments affirmed.*