# CHARLES MILTON WANTLAND v. STATE OF MARYLAND

[No. 1126, September Term, 1979.]

*Decided May 9, 1980.*

The cause was argued before GILBERT, C. J., and MOORE and MASON, JJ.

Michael R. Malloy, Assistant Public Defender, with whom was Alan H. Murrell, Public Defender, on the brief, for appellant.

Kathleen M. Sweeney, Assistant Attorney General, with whom were Stephen H. Sachs, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County, and Joseph C. Sauerwein, Deputy State's Attorney for Prince George's County, on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

The mutilated body of twelve year old Donnie Henley was found on the grounds of the Berger Mansion [1] in Clinton, Prince George's County, Maryland. It was evident that the youth had sustained multiple stab wounds, including one characterized as the *"coup de grace,"* at the point where the skull joins the neck. It was also apparent from the autopsy that the youth's anal orifice was abnormally dilated. The medical examiner was of the opinion that the dilation of Donnie's anal canal was consistent with penetration in the act of anal intercourse.

Young Henley's body was found on Sunday, June 18, 1978, at approximately sixteen to eighteen hours after he met his untimely death. Death was fixed by the medical examiner, Dr. Hormez Guard, at about 6 p.m. to 8 p.m., Saturday, June 17, 1978.

Following the discovery of the Henley boy's maimed corpse, the Prince George's County Police Department investigated in order to ascertain the identity of the person or persons who had snuffed out the young man's life.

The results of the police inquiry, as reflected in the transcript of the trial, disclosed that a number of witnesses placed a Charles Milton Wantland in the vicinity of the area where the deceased was last seen alive. Several witnesses reported that they had seen Henley in the company of the appellant at approximately 3:30 p.m. on Saturday, June 17,

---

1. The Berger Mansion was owned by the County and operated as a CETA (Comprehensive Education and Training Act) Project.

1978. The police discovered on the mansion grounds a pile of burned clothing, an identifiable portion of which matched the witnesses' description of what Wantland was wearing on Saturday, June 17, 1978. Three cigarette butts, all of the same brand that Wantland smoked, were found at a point approximately 40 feet from where the body was discovered. One of the butts, according to the testimony of an F.B.I. agent, bore traces of saliva indicating that an individual of Wantland's blood type had smoked the cigarette. Wantland was questioned as to his knowledge of Henley's activities. Subsequently, Wantland was charged with the offense of first degree murder, a sexual offense of the first degree, and carrying, openly, a deadly and dangerous weapon.

At trial the State introduced three oral statements made by the appellant. The substance of the statements was that Wantland knew Donnie and had previously had homosexual relations with him.[2] The police were informed by Wantland that he was so drunk on the date of the homicide that he remembered nothing of it, but he felt he had committed the crime. According to the officers, Wantland said he must have used a knife from his apartment as the weapon. Five knives were recovered from Wantland's residence; all were introduced into evidence by the State as exhibits.

The medical examiner testified that one of the knives *could* have been used in the perpetration of the homicide. Despite laboratory tests, no trace of blood was found on Wantland's clothing or the knives.

A jury, in the Circuit Court for Prince George's County (Levin, J.), convicted Wantland of murder in the first degree (Md. Ann. Code art. 27, § 407); a first degree sexual offense (Md. Ann. Code art. 27, § 464); and carrying openly a deadly weapon with the intent to injure (Md. Ann. Code art. 27, § 36 (a)). Judge Levin imposed sentences of life, life and three years, all to be served consecutively.

---

**2.** According to Dr. Guard, the victim was not a "habitualistic sodomistic receiver."

Wantland asserts to us that Judge Levin erred in six respects, namely:

1. admitting into evidence illegally obtained incriminating pre-trial statements;
2. admitting into evidence an in-court identification that was based on an impermissibly suggestive photographic lineup;
3. permitting the prosecutor to make improper opening comments to the jury;
4. denying a motion for judgment of acquittal inasmuch as the evidence was insufficient to sustain the convictions;
5. admitting into evidence irrelevant evidence;
6. allowing the medical examiner to give improper testimony.

We shall address each of the issues that Wantland raises in the same order they have been put to us.

I.

## — THE PRE-TRIAL STATEMENTS —

During the course of the investigation into young Henley's death, Corporal David R. Hatfield was assigned to "find anybody [in the area concerned] that could . . . [furnish] either [a] positive or negative response . . . [as to the identity of] a possible suspect. . . ." Wantland, described in the transcript as "the caretaker or occupant of the Berger Mansion"[3] was one of the persons that Hatfield was to interview with respect to the identity of the suspect.

At approximately 10:30 p.m. on Sunday, June 18, 1978, Hatfield and another police officer went to the Berger Mansion where they found Wantland. The officers requested that Wantland accompany them to the Bureau of Criminal Investigation (B.C.I.). The avowed purpose for requesting Wantland to accompany them was to learn what Wantland knew about the crime. Wantland went with the officers.

___

3. *See* n. 1, *supra*.

When the trio arrived at the B.C.I. facility, Wantland was taken to an "Interview Room" at sometime shortly after 11 p.m. No restraints were placed upon him, and he was *not* given the *Miranda* warnings. Hatfield, during the next five hours, succeeded in getting Wantland to make a six page statement. The statement was suppressed by the circuit judge on Wantland's motion.[4]

Hatfield left the Interview Room at the conclusion of the interview, around 3:30 a.m., June 19, 1978. Corporal T.R. Tucker entered about one-half hour thereafter. Tucker informed Wantland that he, Wantland, was under arrest for the murder of Donnie Henley. Tucker related to the court that he "read ... [Wantland] a waiver of rights form" and recorded Wantland's answers to the questions printed thereon. Wantland was then handed the form to read and sign.

The printed form declared that Wantland understood the *Miranda* warnings. With respect to the question of whether Wantland was willing to make a statement without the presence of an attorney, Wantland responded, "No."

Notwithstanding Wantland's express negative reply to the *Miranda* litany, Tucker recounted, Wantland continued to talk. The officer questioned Wantland in order to determine whether Wantland was willing to make a statement even though counsel was not present. According to Tucker, Wantland answered that he wanted to talk.

Prior to any conversation regarding the offenses forming the gravamen of this appeal, Wantland was permitted to use the toilet facilities, as well as to purchase some cigarettes. Upon returning to the Interview Room, Wantland explained to the officer the reason for the negative response to the question on the waiver of rights form relative to counsel. He related that at the time of a prior arrest, "he made a statement to the police and it was in error and it was admitted at the time of trial. . . ." Wantland made clear that

_____

4. Hatfield testified that Wantland was not under arrest. That statement does not comport with *Miranda*.

his objection was to making a *written* statement. Wantland apparently was of the belief that in order to be admissible as evidence a statement had to be in writing. Tucker did nothing to alter or correct Wantland's misbelief, but, instead, acting on the appellant's desire to "talk," began his interrogation. The trial court denied Wantland's attempt to suppress that statement.

The third oral statement was taken the following afternoon by Corporal M.K. Morrissette. Morrissette told the court that he was assigned to take Wantland to the Prince George's County Hospital so that a physician could take samples of the appellant's saliva and blood. While at the hospital, Wantland complained to Morrissette that no one would listen to appellant. Morrissette suggested that he would take a statement following the medical procedure.

At the completion of the sampling, Wantland was transported back to B.C.I. by Morrissette. There, prior to any questioning, Wantland was again advised of his *Miranda* rights. Appellant responded that he was willing to make a statement to the officer without benefit of counsel. It was clear from subsequent remarks that Wantland made the oral statement under the misconception that it could not be used against him. The circuit judge, over objection, admitted the statement into evidence.

The fourth and final statement was made by appellant to Corporal Rowzie, the coordinator of the investigation. Rowzie told Judge Levin that on July 5, 1978, he went to Prince George's County Detention Center in order to speak to Wantland. Before there was any contact between Rowzie and the appellant, an unidentified correctional officer explained to Wantland that he was entitled to have his attorney present during any interview with the police officer. A form entitled "Detainee Waiver," the text of which purported to be a waiver of that right, was presented to Wantland, who signed the form.

Rowzie recounted that he then advised the appellant of the full panoply of *Miranda.* Wantland was asked if he understood those rights, and he replied in the affirmative. According to the officer, the appellant then stated that he

already had an attorney, but that he did not desire the attorney's presence during the interview. That, of course, is precisely what he waived when he signed the form presented to him by the guard. Rowzie questioned the appellant and took an oral statement which was admitted, over objection, at trial.

## — THE LAW —

Appellant asserts that each of the three statements that were received into evidence should have been suppressed because:

a) The State failed to prove a knowing and voluntary waiver since Wantland did not know that an oral statement could be used against him;

b) Each of the statements was the product of the failure of police to respect his right of cut off of questioning, a right he had asserted to Corporal Tucker; and

c) Each of the statements was the fruit of the poisonous tree, *i.e.*, they grew out of the illegal statement to Hatfield (and appellant, assuming that the Tucker and Morrissette statements were illegal avers that those statements taint the succeeding statements).

Additionally, Wantland assails the statement to Corporal Rowzie on the basis that he did not knowingly waive his right to counsel, even assuming *Miranda* compliance.

## — *MIRANDA V. ARIZONA* AND ITS SIBLINGS —

In 1966, in the landmark decision of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the Supreme Court engrafted upon the Fifth and Sixth Amendments the prophylactic warnings now entitled "*Miranda* rights." The effect of *Miranda* is that before any in-custody statement made by an accused in response to interrogation is admissible into evidence, the prosecution must first demonstrate that the accused was advised of the

rights articulated and specified in the *Miranda* case and knowingly and intelligently waived those rights. The burden is on the prosecution to establish by a preponderance of evidence that *Miranda* rights were given and waived by the accused. *Lego v. Twomey,* 404 U.S. 477, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); *Mulligan v. State,* 18 Md. App. 588, 308 A.2d 418 (1973).

When a suspect stands upon the constitutional guarantees delineated in *Miranda,* the police must respect that decision. *Miranda* makes manifest that:

> "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." (Footnote omitted.) 384 U.S. at 473-74, 86 S. Ct. at 1627-28, 16 L. Ed. 2d at 723.

Notwithstanding *Miranda's* seeming proscription of further interrogation, the Supreme Court, in *Michigan v. Mosley,* 423 U.S. 96, 102, 96 S. Ct. 321, 326, 46 L. Ed. 2d 313, 320 (1975), said that "literal interpretations [of that language] would lead to absurd and unintended results." Mr. Justice Stewart, speaking for the Court in *Mosley,* observed

that "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity. . . ." *Ibid.* Thus, "the admissibility of statements obtained after the person in custody has decided to remain silent depends . . . on whether his 'right to cut off questioning' was 'scrupulously honored.' " 423 U.S. at 104, 96 S. Ct. at 326, 46 L. Ed. 2d at 321.

On the other hand, an accused may decline to rely upon the safeguards afforded by the Fifth and Sixth Amendments. Consequently, the police may interrogate him. When that is alleged to be the situation, "[a] heavy burden rests upon the . . . [State] to demonstrate that the defendant knowingly and intelligently waived his privilege[s] . . . ." *Miranda, supra* at 475, 86 S. Ct. at 1628, 16 L. Ed. 2d at 724. "The courts must presume that a defendant not waive his rights; [so that] the prosecution's burden [of showing a waiver] is great. . . ." *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S. Ct. 1755, 1757, 60 L. Ed. 2d 286, 292 (1979). *See also Tague v. Louisiana,* 444 U.S. 469, 100 S. Ct. 652, 62 L. Ed. 2d 622 (1980). Waiver is not a matter of form, but rather one of fact weighed in the light of the totality of the circumstances. *Fare v. Michael C.,* 442 U.S. 707, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979). *See also North Carolina v. Butler, supra.*

At any suppression hearing, the State must carry the onus of establishing by a preponderance of the evidence that the waiver was voluntary, knowing, and intelligent. *Lego v. Twomey, supra; Mulligan v. State, supra.*

(a)

The substance of appellant's first contention is that he did not know that an *oral statement* could be used against him in court. His misunderstanding, he says, precluded his having made a voluntary, knowing, and intelligent waiver.

Much the same contention as that now made by Wantland was advanced to the Supreme Court of New Jersey in *State*

*v. McKnight,* 52 N.J. 35, 243 A.2d 240 (1968). There, a defendant made an oral statement which was transcribed by a detective. When the transcription was completed, the accused was asked to affix his signature thereto, but he requested that he not do so until his attorney could read it. The statement was never signed. At trial the accused argued that the waiver "was not 'intelligently made' because he thought" the oral statement could not be used against him.

Chief Justice Weintraub, for the Court, rejected that contention, observing:

> "Nowhere does *Miranda* suggest that the waiver of counsel at the detectional stage would not be 'knowing' or 'intelligent' if the suspect did not understand the law relating to the crime, the possible defenses, and the hazards of talking without the aid of counsel, or if the suspect was not able to protect his interests without such aid, or, in terms of the plurality opinion in *Von Moltke* [*v. Gillies,* 332 U.S. 708, 68 S. Ct. 316, 92 L. Ed. 309 (1948)], if it was not 'wise' of the prisoner to forego counsel or the right to silence. . . . However relevant to 'waiver' of the right to counsel at trial or in connection with a plea of guilty, those factors are foreign to the investigational scene where the detection of the guilty is the legitimate aim.
>
> Hence if a defendant was given the *Miranda* warnings, if the coercion of custodial interrogation was thus dissipated, his 'waiver' was no less 'voluntary' and 'knowing' and 'intelligent' because he misconceived the inculpatory thrust of the facts he admitted, or because he thought that what he said could not be used because it was only oral or because he had his fingers crossed, or because he could well have used a lawyer. A man need not have the understanding of a lawyer to waive one. Such matters, irrelevant when the defendant volunteers his confession to a friend or to a policeman passing on his beat, are equally irrelevant when the

confession is made in custody after the coercion of custodial interrogation has been dispelled by the *Miranda* warnings. With such warnings, the essential fact remains that [the] defendant understood he had the right to remain silent and thereby to avoid the risk of self-incrimination. That is what the Fifth Amendment privilege is about." [5] (Citations omitted.) 52 N.J. at 54-55, 243 A.2d at 251-52.

The Fourth Circuit, in *Harris v. Riddle,* 551 F.2d 936 (4th Cir. 1977), when faced with an identical argument to that now before us, concluded that the officers need not correct the misapprehension of the accused. The Court stated:

"But *Miranda* does not put upon the police the burden of explaining the rules of evidence and the substantive criminal law. The average interrogating police officer is not capable of it. It surely would have been helpful to Harris to have had a lawyer present to explain to him the felony-murder doctrine and the admissibility of an oral confession. But police officers cannot act as counsel even if the burden were properly theirs, and it is not. When the police have fully and fairly given a suspect the *Miranda* warnings their duty is discharged, and we hold that they are under no further and additional duty whether or not the suspect acts wisely or foolishly or misapprehends either the facts or the law." 551 F.2d at 938-39.

We responded in much the same vein to a contention in *Greenwell v. State,* 32 Md. App. 579, 363 A.2d 555 (1976) that a defendant was unable to understand the *Miranda* warnings because of a learning disability. Judge Powers, for this Court, noted:

"When Mr. Chief Justice Warren said for the Supreme Court in *Miranda* that a waiver of the

---

**5.** In addition to rejecting the claim on the legal basis, the court also rejected the claim as a matter of fact, labeling it "absurd."

right must be made 'voluntarily, knowingly and intelligently', the Court did not mean, we take it, that the waiver must stand up under three different tests. *We understand the words 'knowingly and intelligently' to have been used to put a gloss on the word 'voluntarily', so that for the purpose of a waiver it carries with it a connotation that the volunteer is aware that he may not be compelled to incriminate himself, but has still decided to talk. It is the fact of his decision, not the wisdom of it, for which we look.* Surely the word intelligently could not have been intended to mean wisely, for who is to judge, retrospectively, the ethical wisdom of telling the truth, even when it hurts." (Emphasis supplied.) 32 Md. App. at 587, 363 A.2d at 561.

We decline to adopt the view that *Miranda* requires a waiver to be wisely made. Were we to follow that path, the police would be forced into the role of counsel for an accused. *Miranda* does not require that an accused be apprised of the evidentiary value of a statement. The duty of the police was discharged in the instant case when Wantland understood he could remain silent, and he relinquished that privilege with that awareness. It was not incumbent upon the police to instruct Wantland, even if they were qualified to do so, as to the effect of an oral statement *vis-a-vis* one that is written.

(b)

Appellant next asserts that because of his expressed desire for counsel, as made to Corporal Tucker, all subsequent statements violated *Miranda*. This is so, Wantland says, because the police failed to respect his right to "cut off interrogation."

Even if we assume *arguendo* that Wantland's response to Tucker precluded further questioning by that officer, the statement to Morrissette and the statement to Rowzie were made at a time occurring well after the initial assertion to

Tucker.[6] Each officer testified that he, prior to renewing questioning, informed Wantland of the *Miranda* rights. Neither Morrissette's nor Rowzie's testimony was controverted. Our review of the record indicates that appellant's rights were "scrupulously honored." *Michigan v. Mosley, supra.*

Appellant would have us read *Miranda* and its progeny to hold that once Wantland indicated that he would not make a statement without counsel, any statement obtained thereafter is illegal. To so read *Miranda* would mean that we would give no cognizance whatsoever to *Tague, Fare,* and *Butler.* Those three cases, post-dating *Miranda,* make unmistakable that the question of waiver is one of fact to be determined from the totality of the circumstances. *See also Leuschner v. State,* 45 Md. App. 323, 413 A.2d 227 (1980).

Tucker's uncontradicted testimony was that after Wantland declined to talk without counsel's being present, Wantland continued to speak. When questioned again as to whether he wanted to make a statement without counsel, Wantland said what he meant was that he would not make a *written* admission. We believe the record supports a factual finding that Wantland made a valid waiver of his right to remain silent, his right to counsel, and the remainder of the *Miranda* panoply.

(c)

Wantland next attacks the three oral statements as being the toxic fruit of the upas tree and, hence, inadmissible.[7]

We said, in *Fried v. State,* 42 Md. App. 643, 646, 402 A.2d 101, 102-03 (1979), that "the doctrine of taint, *i.e.,* fruit of

---

**6.** The statement to Morrissette was more than twelve hours after appellant's "cut off" articulated to Corporal Tucker. The statement to Rowzie occurred after a lapse of sixteen days following the Wantland-Tucker episode.

**7.** As we indicated before, appellant assumes that each of the other statements was also illegal and taints all succeeding statements. In view of our rulings on the Tucker and Morrissette statements, we need not consider the point.

540

the poisonous tree, does not follow from a 'mere *Miranda*' violation, *c.f., Bartram v. State,* 33 Md. App. 115, 163-67 [, 364 A.2d 1119] (1976), *aff'd* 280 Md. 616 [, 374 A.2d 1144] (1977), but applies only to confessions *involuntarily* obtained as by improper inducements or coercion." (Emphasis in original.) The record in the matter *sub judice* does not contain any evidence of improper inducement or coercion. We observe no error in the admission of Wantland's statements.

(d)

Appellant's final assault on the admission into evidence of his statements focuses solely on the statement that he made to Corporal Rowzie in the Prince George's County Jail. Wantland argues that the statement to Rowzie is invalid because counsel had been appointed for Wantland at the time the statement was made. He asserts that under *Massiah v. United States,* 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), "the bare-bones *Miranda* warnings given ... by ... Rowzie" were insufficient to apprise him of his rights, and any purported waiver thereof was ineffective.

The Court of Appeals, in *Watson v. State,* 282 Md. 73, 382 A.2d 574, *cert. denied,* 437 U.S. 908 (1978), *aff'g* 35 Md. App. 381, 370 A.2d 1149 (1977), after considering the effect of *Brewer v. Williams,* 430 U.S. 387, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977) under its prior holding in *State v. Blizzard,* 278 Md. 556, 366 A.2d 1026, *rev'g* 30 Md. App. 156, 351 A.2d 443 (1976), held that a "bare-bones *Miranda* warning" is sufficient to support a waiver of the right to counsel.

II.

Wantland next directs his barrage upon identifications of him that were made by two witnesses. Appellant alleges the identifications were the result of an impermissibly suggestive photographic lineup. It is unnecessary for us to resort to the detailed analyses required by *Neil v. Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); *Foster v. State,* 272 Md. 273, 323 A.2d 419, *cert. denied,* 419 U.S. 1036 (1974); and *Dobson v. State,* 24 Md. App. 644, 335 A.2d 124, *cert. denied,* 275 Md. 747 (1975), because appellant has

set forth no factual basis for his assertion of suggestiveness. Our own review of the array does not disclose any impermissibleness.

## III.

Because the prosecutor, in his opening argument, improperly referred to the Hatfield statement, which had been suppressed by the trial court, Wantland perceives reversible error in the trial judge's refusal to order a mistrial. *Comi v. State,* 26 Md. App. 511, 338 A.2d 918, *cert. denied,* 276 Md. 740 (1975).

Judge O'Donnell, in *Wilhelm v. State,* 272 Md. 404, 411-12, 326 A.2d 707, 714 (1974), said for the Court of Appeals:

> "The primary purpose or office of an opening statement in a criminal prosecution is to apprise with reasonable succinctness the trier of facts of the questions involved and what the State or the defense expects to prove so as to prepare the trier of facts for the evidence to be adduced. While the prosecutor should be allowed a reasonable latitude in his opening statement he should be confined to statements based on facts that can be proved and his opening statement should not include reference to facts which are plainly inadmissible and which he cannot or will not be permitted to prove, or which he in good faith does not expect to prove. An opening statement by counsel is not evidence and generally has no binding force or effect. *To secure a reversal based on an opening statement the accused is usually required to establish bad faith on the part of the prosecutor in the statement of what the prosecutor expects to prove or establish substantial prejudice resulting therefrom. Clarke v. State,* 238 Md. 11, 19-20, 207 A.2d 456, 460 (1965); *Ott v. State,* 11 Md. App. 259, 266, 273 A.2d 630, 634, *cert. denied,* 262 Md. 748 (1971)." (Emphasis supplied.)

Wantland has demonstrated neither prejudice to him, nor

bad faith on the part of the prosecutor. Moreover, the jury was properly cautioned that counsel's argument was not evidence. Judge Levin did not abuse his discretion in refusing to order a mistrial.

## IV.

From the barrage on the alleged error in not granting a mistrial, Wantland turns his field of fire to the judgment resulting from a violation of Md. Ann. Code art. 27, § 36 (a), carrying a deadly weapon openly with intent to injure. He states that the only testimony on the point was that of Aliscia Baker. She said that a man, identified by others as Wantland, that she had seen on the road near young Henley prior to the murder, had an object that "looked like an army knife." The appellant points out that in her original statement to police, Ms. Baker made no reference to a knife.

Ms. Baker's failure to refer to the knife in her original version goes to the weight of her evidence, not its admissibility. The jury was free to believe Ms. Baker's testimony or to reject it. If they chose to believe it, as they obviously did, they could infer from that evidence, coupled with the fact that young Henley was stabbed and his throat was cut, that the appellant did carry a knife with the requisite intent to injure. In our view the evidence was sufficient to permit the jury to find that Wantland was guilty of violating Md. Ann. Code art. 27, § 36 (a) beyond a reasonable doubt.

## V.

Penultimately, Wantland sees something insidious in the testimony of the medical examiner that a knife, obtained in a search of the Berger Mansion, *could* have been used to kill the victim. Appellant maintains that the knife was never "connected to the alleged murder" and is, therefore, irrelevant. We shall not consider the relevancy *vel non* of the knife inasmuch as, subsequent to the doctor's testimony, the knife was admitted into evidence without objection. The failure to object constitutes a waiver of the issue. Yet, were the matter properly before us, we would hold that even if the

admitted testimony was erroneous, it was harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976).

## VI.

Ultimately, Wantland takes aim on the testimony of the medical examiner, Dr. Hormez Guard. Appellant asseverates that it was error for the trial judge to allow the doctor "to testify that it was a reasonable probability that certain things *could* have happened." (Emphasis in original.) Appellant thinks that the doctor should not have been permitted to testify that sodomy could be the cause of the dilation of the victim's anus, nor that the knife exhibited to him could have caused the injuries.

It is well established that in this State a medical expert is not required to express his opinion with an absolute certainty, but only with a reasonable probability. *Andrews v. Andrews,* 242 Md. 143, 152, 218 A.2d 194, 200 (1966).

A medical expert is not limited to expressing his opinion as to what actually did happen; he may opine, based on a reasonable medical certainty, that which could have happened, provided, of course, that there is sufficient evidence of a causal connection. *See Hughes v. Carter,* 236 Md. 484, 486, 204 A.2d 566, 567-68 (1964). It was for the jury to find, based on all the evidence, whether sodomy did occur, and whether a particular knife was used in the slaying. We perceive no error.

*Judgments affirmed.*
*Costs to be paid by appellant.*