LARRY DONNELL PHARR *v.* STATE
OF MARYLAND

[No. 732, September Term, 1976.]

*Decided July 7, 1977.*

The cause was argued before POWERS, MOORE and LISS, JJ.

*Bradford C. Peabody, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *William Spellbring, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

POWERS, J., delivered the opinion of the Court.

Larry Donnell Pharr was found guilty by a jury in the Circuit Court for Prince George's County of charges of rape, committing an unnatural and perverted sexual practice, kidnapping, robbery with a dangerous and deadly weapon, and use of a handgun in the commission of a crime of violence. He appeals from the judgments entered against him on those verdicts, and raises two questions in this Court. They are:

1. Did the trial court err in denying Appellant's motion to suppress the extra-judicial confession?
2. Was the evidence sufficient to sustain Appellant's conviction for use of a handgun in the commission of a crime of violence?

### The Corpus Delicti

Although the facts of the crimes are not at issue in this appeal, we shall summarize briefly the events upon which the charges were based, as they were related in court by the

victim, a young woman. Shortly after 9:00 P.M. on 9 September 1975, having purchased a pair of shoes in a store in the shopping center known as Landover Mall, in Prince George's County, she proceeded to her car on the parking lot. As she got to her car a man came up behind her and stuck a gun in her back. The man told her not to shout or scream, and to get in the car. She got in the driver's seat and he entered the seat behind her. At his direction she drove to the end of a nearby dead end street, parked and got out. The assailant led the woman into a wooded area, ordered her to lie on the ground, and not to look at him. If she looked at him, he said, or if she screamed, he would shoot her. He was holding what she described as a silver handgun, which he cocked and uncocked several times. She turned her head to the right as she was lying on her back, and he held the gun at the left side of her head. He lay on top of her, pulled her panty hose and underpants down, and pulled his pants down. She was whining and whimpering, asking him not to shoot.

The attacker had forcible sexual intercourse with the woman. Then he held his hand over her eyes, and put his penis in her mouth for a brief time. He had sexual intercourse with her again. The man got up, she pulled up her clothes, and they walked back to her car. He took her keys and her pocketbook, and told her to get in the back. She crouched down between the seats. The man took the shoes she had bought out of the paper shopping bag they were in, and put the bag over her head. He drove for some time, stopped and summoned a friend, who followed in another car. He parked her car, took her new shoes and her watch as well as her pocketbook, then told her to stay still for five minutes. He said that her keys were on a garbage pail behind the car.

She never got a good look at her attacker, and she was not able to identify him. The victim waited, and after a few minutes she got out of the car, found her keys, and drove until she reached a gas station. The attendant called the police. About 10 days later her wallet came back to her in the mail.

One week later an almost identical occurrence took place, involving a different young woman accosted on the parking lot of the Landover Mall shopping center. The police proceeded with investigation of both crimes.

By 23 September 1975, two weeks later, the police had identified a fingerprint found on the shoe store shopping bag, mentioned above, as the fingerprint of Larry Donnell Pharr. Facts developed by the police in their investigation of these two attacks, as well as a third reported attempt, led the police to obtain warrants on 23 September 1975 for the arrest of Pharr on several charges.

## The Confessions

At about 6:30 P.M. on 23 September several detectives of the Bureau of Criminal Investigation of the Prince George's County Police, and a uniformed member of the force, went to the home of Larry Pharr in Prince George's County with warrants for his arrest. They placed him under arrest, took him into custody, and took him to the offices of the Bureau of Criminal Investigation. There Corporal Alvin Hall, Jr. conducted an interview or interrogation of Pharr, during which Pharr allegedly confessed to Cpl. Hall that he had committed the crimes involved in this case. Cpl. Hall wrote down what Pharr said.

Trial of this case was held in the Circuit Court on 8 June 1976, Judge William B. Bowie presiding. A motion to suppress the statement was heard by the trial judge, out of the presence of the jury, during the course of the trial. The motion was denied. The statement was later admitted into evidence, over objection, when it was offered during Cpl. Hall's testimony before the jury.

Denial of the motion to suppress the statement is the principal issue in this appeal. To determine whether the ruling was correct, we look to the record of the suppression hearing, *Haslup v. State*, 30 Md. App. 230, 240, 351 A. 2d 181 (1976).

Cpl. Hall testified that he rode with Pharr in a police cruiser, driven by another detective, to the office at For-

estville. As he entered the cruiser, he identified himself, and read to Pharr from a short form rights card. Pharr said, "You believe I did this, but I did not." Hall told Pharr they would not talk about it in the cruiser, but would talk about it when they got to the Bureau. When they arrived there he took Pharr to an interview room, and advised him of his rights by reading the long form waiver of rights to him.

The form, a letter sized sheet, signed by Pharr, was placed in evidence. There is no contention that the so-called warnings failed in any way to conform fully with the requirements of *Miranda v. Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966). The last sentence of the warnings reads:

"You are further advised that you are not promised anything to make a statement and no threats or inducements have been made to compel you to make a statement."

The next paragraph of the form contains these lines: "Having been so advised, are you willing to make a statement?" "Reply of defendant; Yes      LP      ." Below the reply is the rest of the form:

## "WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed:     Larry Pharr

Witness: Cpl. A. Hall, Jr. Time:      704 PM"

Hall testified that when he read the question, "are you willing to make a statement?" Pharr said yes, which he wrote on the sheet, and initialed next to it. At the end of the

waiver Pharr signed his name and wrote the time. Hall talked with Pharr about 15 or 20 minutes about general things, and then begain taking a statement in reference to a rape case which had occurred at Landover Mall.

That statement, with the time 1930 [7:30 P.M.] noted at the head, described the accosting and rape of a [Mrs. C.] on 16 September. It begins with a short narrative in Cpl. Hall's handwriting, and continues with a series of questions and answers. Cpl. Hall testified, "The questions are my questions. The answers are what he related to those questions." Each of the four pages is signed, perpendicular to the lines of the handwriting, with the name Larry Pharr, in what the detective said was Pharr's handwriting. Pharr's signature is also at the bottom of the last page.

The statement, relating to a different occurrence, was received in evidence at the suppression hearing in the present case. When that statement was concluded, Cpl. Hall took statements from Pharr about two other cases, then, timed at 2100 [9:00 P.M.], a brief addendum to the first statement. Next, timed as beginning at 2105 [9:05 P.M.], he took a statement in reference to the rape of [Miss H.] on 9-9-75, the statement at issue in this case. It contains a short narrative, followed by questions and answers. Each page was signed, across the handwriting, by Larry Pharr, and his signature is at the end.

We set out here the complete statement:

"About two weeks ago I was at Landover Mall outside the Hecht Co. and saw a girl walking to her car. I walked up next to her and put my gun in her side and told her to be quiet. I told her to get in and drive. I told her to drive to the dead end street across from Landover Mall. She got out of the car when I told her to. Then I walked her back into the woods. Then I raped her. Then I made her get in the back seat and put the bag over her head. Then a friend of mine followed me down to Ritchie Rd. and I got out of her car and left the keys to her car on a trash can. Then my friend drove me home.

Q. What time did you first see the girl?

A. About 9:30 P.M.

Q. Was the Mall open?

A. Yes, it was still open.

Q. What kind of car did the girl have?

A. A yellow Camero.

Q. What was the girl wearing?

A. A Plaid dress, she had a pocketbook.

Q. Did you take any money from her.

A. About $18 in cash, plus her pocketbook which I mailed back to her.

Q. Where did you mail it to?

A. I left it in a mail box on the D. C. side across from the Jumbo in Seat Pleasant.

Q. What do you mean by you raped her?

A. had intercourse with her.

Q. Was she scared?

A. Who wouldn't be scared with a man who had a gun in his hand.

Q. Where did you rape her?

A. By the woods at the dead end street.

Q. What were you wearing that day?

A. I don't remember.

Q. What kind of gun did you have?

A. A Silver blank gun.

Q. Where is it now?

A. A friend of mine has it.

Q. Who is the friend?

A. He didn't have anything to do with the rape, so I won't tell you who he was.

Q. Where did you first meet him?

A. At his house.

Q. Where is that?

A. I won't tell.

Q. Where did you get the gun?

A. From a white boy named Beall who use to live on Hill Rd.

Q. When did you first put the bag on the girls head?

A. After I raped her, because I didn't want her to see what I looked like.

Q. Did you tell the girl the gun was loaded?

A. Yes, but it really wasn't.

Q. What did you do with the money you got?

A. Spent it.

Q. Is this statement true and correct to the best of your knowledge and recollection.

A. Yeah.

Q. Were you advised of your rights prior to making this statement?

A. Yes.

Q. Is there anything you wish to add to this statement?

A. I know she called it rape, but it wasn't rape.

Q. In the first part of your statement you called it Rape now you say it wasn't, why?

A. Because I didn't force her clothes off and she said she would do anything as long as I didn't hurt her."

Pharr testified. He had turned 18 in August. He said that when the police came, he was at the kitchen table, eating dinner. He said he heard the knock, and his brother answered the door. He heard his brother say, "Get the shotgun out of my face." Larry Pharr went to the door. One of the officers was holding a shotgun, pointed down. Pharr said he was under the influence of marijuana and vodka, but "I kind of woke up a little bit when he started shoving me around." Pharr said that his mother had taken him to a clinic at a hospital that day, where he had a check-up. She had brought him back about 3:00 o'clock, and dropped him off at a friend's house, where he saw several other friends.

He said he had the vodka 15 minutes after his mother brought him back, and that he had smoked marijuana at his friend's house. He walked home from there.

Appellant told of being in the interview room with Cpl. Hall. Nobody else was there, except that a detective came to the door for a moment, and left. Pharr said Hall read to him from a paper, and that the signature "Larry Pharr" at the bottom was his, although he said that the initials "LP" above were not his handwriting. He said he knew that he was signing a piece of paper, and that it pertained to his rights, but that he did not read it.

Pharr testified that they were sitting at a desk, and Cpl. Hall had some papers and a pencil, and he was writing. The officer turned to him and said, "Now, let's hurry up and get this over with so we can try and get you out of here." Asked by his counsel, "Did you sign across those pieces of paper?", Pharr said, "Not at that time." He quoted Cpl. Hall:

> "The sooner you cooperate with us the sooner we can get you out of here and some people were in for armed robberies and murder get personal bond, and if you cooperate I'll go down there and talk to the clerk and see if I can get you personal bond."

Pharr signed his name across the papers, on every sheet. He did not read them. He testified that he had been advised of his rights and booked many times before, as a juvenile; he guessed more than 10 times.

Appellant also called as a witness at the suppression hearing a member of the Sheriff's Department, a classification officer, formerly program officer at the County Detention Center. She had done remedial reading work with Pharr. She had given him self-administered tests which indicated to her that his reading comprehension was at the level of the second grade, seventh month. The witness saw Pharr frequently over a period of months and had verbal communication with him. There was no time in which he did not seem to understand what she said to him. She never had any trouble communicating with him.

Appellant also put in evidence at the suppression hearing his Juvenile Court records in approximately 20 cases, for the purpose of showing that testing at the various places he had been detained showed a low level of comprehension.

Argument for the appellant at the suppression hearing was that the statement should be suppressed because there was not a knowing and voluntary relinquishment by Pharr of his constitutional rights — that Pharr did not make a knowing and intelligent waiver, because of his youth, his IQ of 82, his low level of comprehension generally, and because at the time he was under the influence of alcohol and marijuana. There was no contention, not even the slightest suggestion, that Pharr had been induced to confess by any promise held out to him.[1]

It was the duty of the State to persuade the hearing judge by a preponderance of the evidence that Pharr knowingly and voluntarily made the statement attributed to him. *Mulligan v. State*, 18 Md. App. 588, 308 A. 2d 418 (1973). Judge Bowie was so persuaded. With respect to the temporary effect of alcohol and marijuana upon appellant's capacity to understand what he was doing, Judge Bowie said to Pharr:

> "That's your statement * * * that you were under the influence of alcohol and marijuana and I don't believe it."

That contention was rejected on the basis of the judge's assessment of its credibility, in the light of all of the circumstances, including Pharr's detailed recital of events both before and after his arrest.

On the question of Pharr's ability to comprehend what was read and said to him, as well as the nature of his interrogation, both temporarily because of the alleged

---

1. It may be of some significance that no instruction was asked or given regarding the effect of inducement on the voluntariness of a confession, nor was there any reference whatever to a claim of inducement in the argument to the jury, although Pharr gave substantially the same testimony before the jury.

intoxication, and generally because of his level of understanding, Judge Bowie commented:

"I would observe for the record * * * we are looking at these people, we are hearing them and getting the sense of the whole picture. As far as I'm concerned he came over loud and clear. He came over very loud and clear. I'm convinced that he thoroughly and completely and fully knew and understood everything that was asked of him in here. And his answers made sense to what were put to him by his own attorney and by [the prosecutor]."

Regarding a suggestion that Pharr did not read the pages of the statement when he signed them, the judge explained the minimal significance of the signatures. He said:

" * * * all we are confronted with here as I see it is the officer said he put down on the yellow paper what the defendant told him. We are not here confronted with a piece of paper that the officer had presented to the defendant to read and then sign his name. That is not it. This was a record, an accurate record, if you will, of what the defendant had told him. And all he is doing is he signs his signature to show that he was there at the time it was done, not that he read it over or anything else, or that it was a strange piece of paper as it was in these tests. It was his conversation put down in writing."

The court ruled:

"So we conclude on the totality of the circumstances that this defendant fully and completely understood what his rights were, and that he waived them, and when he gave any statement it was voluntarily, freely, voluntarily, and understandingly made."

## The Alleged Intoxication

In *Dempsey v. State,* 277 Md. 134, 355 A. 2d 455 (1976), the Court of Appeals, citing *Bryant v. State,* 229 Md. 531, 185 A. 2d 190 (1962) and *Mundell v. State,* 244 Md. 91, 223 A. 2d 184 (1966), said, at 151:

> "In *Bryant* and *Mundell,* the Court set forth the general principle that evidence of mental impairment from drugs or alcohol does not per se render a confession involuntary, and that a court may admit a confession into evidence if it concludes that it was freely and voluntarily made despite the evidence of mental impairment."

The Court said further, at 153-54:

> "We do not suggest in this case that the evidence concerning Dempsey's drinking and alleged intoxication required the trial judge or the jury to find that his confession was involuntary. On the contrary, we reiterate that the mere fact that a defendant has been drinking or is under the influence of alcohol at the time of his confession does not as a matter of law require the conclusion that the confession was not freely and voluntarily made."

In that case the evidence was sufficient to raise a legitimate jury issue as to voluntariness after the confession was in evidence before the jury. That issue was equally available to the appellant in this case, and was argued by him.

Upon our independent review of the evidence on the issue of impairment by intoxication we reject, as not credible, appellant's contention that his state of intoxication rendered his confession unknowing and involuntary.

## Capacity to Comprehend

Appellant's testimony at the suppression hearing, and the record made by Cpl. Hall of appellant's narrative descrip-

tion of events, and his answers to several series of specific questions at the time of the interrogation on 23 September 1975, all provide a basis for determining whether he understood what he and Cpl. Hall were talking about.

Cpl. Hall's testimony of what he read to Pharr, and Pharr's statement to him that he understood furnishes additional insight. The hearing judge's observation and impression of Pharr's comprehension are highly important.

Upon our own evaluation of the record we too are persuaded by a preponderance of the evidence that what Pharr heard and what he said during his interrogation by Cpl. Hall, were heard and said with understanding. *Greenwell v. State*, 32 Md. App. 579, 363 A. 2d 555 (1976).

### The Inducement

A third factor affecting the question of voluntariness, and thus admissibility of appellant's confession, has been injected for the first time in this appeal. It is, of course, a part of the overall issue of suppression for involuntariness, which was raised and decided below.

Inducement is argued here on the basis of the alleged statement of Cpl. Hall, as testified by Pharr, that, "if you cooperate I'll go down there and talk to the clerk and see if I can get you personal bond." Cpl. Hall was not recalled to refute that testimony.

It is indeed the law, as appellant points out, citing *Smith v. State*, 189 Md. 596, 56 A. 2d 818 (1948), that to be admissible in evidence a confession must be the free and voluntary act of the accused. In that case the Court of Appeals said at 603-04:

"Before a confession can be admitted in evidence, the State must show, to the satisfaction of the court, that it was the free and voluntary act of an accused; that no force or coercion was exercised by the officers obtaining the confession, to cause the accused to confess; that no hope or promise was held out to an accused for the purpose of inducing him to confess."

The rule has been stated and applied in many cases, by the Court of Appeals, and by this Court. Appellant cites and quotes from *Robinson v. State*, 3 Md. App. 666, 240 A. 2d 638 (1968), in which Chief Judge Murphy said for this Court, at 670-71:

> "It is well settled that in order for a confession to be admissible into evidence against an accused, the State must prove that it was voluntary and not the product of force, threats, promises or inducements. *Abbott v. State*, 231 Md. 462; *Cooper v. State*, 1 Md. App. 190. Otherwise stated, to be voluntary, a statement cannot be 'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.' "

A pitfall for the State may be created when at a suppression hearing the defendant testifies that he was induced to confess by a promise held out to him (or by a threat made, or other coercion brought to bear upon him) by a police officer. If such testimony is foreseen, the prosecutor may refute it in advance. If it is not foreseen, and not already refuted or rebutted, the prosecutor *must* call as a witness the person alleged to have made the promise or threat, or a person in whose presence it was allegedly made, so as to refute the allegation.[2] Failure to do so may require exclusion of the confession.

The need for prosecutorial alertness, and the serious consequences of its lack, have been illustrated in numerous cases in the Court of Appeals and in this Court. A rule, frequently identified with the case of *Streams v. State*, 238 Md. 278, 208 A. 2d 614 (1965), was stated earlier in *Mercer v. State*, 237 Md. 479, 206 A. 2d 797 (1965). In the latter case the accused had made a confession after interrogation for about two and one half hours, with three different officers

---

2. We do not mean to suggest that the State should attempt to refute an allegation that is true. If it is true, we would not expect the State to offer the confession at all. If the question is borderline, the State should lay out all of the facts.

participating from time to time. At a hearing to suppress, the accused testified that two named officers used physical force upon him. The Court said, at 483-84:

"Sergeant Salter was the only officer produced by the State who testified as to the voluntariness of the appellant's admissions. Sergeant Salter testified that the appellant's statements were given at the police station some two and one-half hours after the appellant had been brought there and that while he, the Sergeant, was in the room with the appellant, no one touched him. The Sergeant testified, however, that he was not in the room with him the entire time and that he had left prior to the alleged beating. When he returned to take the statement he did not observe any bruises or marks upon the appellant and he said the appellant did not make any complaint to him that he had been hit or mistreated by anyone. Detectives Montgomery and Clements were not called to the stand.

"We have repeatedly held that the burden is upon the State to show that a confession offered in evidence is a voluntary act of the accused and not a product of force or threats. *Combs v. State*, 237 Md. 428. *Bean v. State*, 234 Md. 432, 199 A. 2d 773 (1964); *Abbott v. State*, 231 Md. 462, 465, 190 A. 2d 797 (1963); *Jackson v. State*, 209 Md. 390, 394-95, 121 A. 2d 242 (1956). The testimony of the appellant that he was physically mistreated by the two detectives was uncontradicted by either of the persons named. The fact that Sergeant Salter testified he did not observe any marks upon the appellant and that the appellant made no complaint to him when the Sergeant returned to the room is not of itself sufficient, in our opinion, to rebut the appellant's testimony. Neither of the detectives

accused by the appellant of mistreating him was called to the stand by the State."

In *Streams* [3] the Court said, at 282:

"It may be enough if one credible witness can testify from personal observation that nothing was said or done prior to and during the obtention of the confession to mar or destroy its voluntary character and there is no claim by the prisoner of improper treatment by others than those covered by such testimony."

In *Price v. State*, 261 Md. 573, 277 A. 2d 256 (1971), the Court of Appeals referred to the *Streams* rule, but held that the facts there did not call for its application. The *Streams* rule was held clearly applicable in *Gill v. State* 265 Md. 350, 289 A. 2d 575 (1972), so as to require reversal because testimony that a confession was induced was unrebutted by the only person able to rebut it.

In *Ponds v. State*, 25 Md. App. 162, 335 A. 2d 162 (1975), we rejected a contention that the *Streams* rule required the suppression of a confession. We said, at 176:

"It is true that no specific denial of those specific words [an alleged promise by an officer to assist the defendant in getting out on personal bond that night] are to be found in the record."

We pointed out that there was conflicting testimony relating to the *time* the alleged inducement took place, if it took place at all. We said, at 176:

"Thus the trier of facts was confronted by the necessity to resolve the critically dispositive conflicting testimony. If the trial judge believed the testimony of McFee and Staccone, there manifestly

---

**3.** The opinion in Streams has led to some confusion. The rule it states is clear enough. But the facts in the case presented two separate occasions, in one a promise, and in the other, a promise and a threat. Applied to the first, the rule required reversal. Applied to the second occasion, it appears that the requirements of the rule were met. It is not entirely clear whether the reversal was based on one of the occasions, or on both.

was no promise that induced the Ranier [a burglary victim] confession. On the contrary if the trial judge believed the testimony of Ponds, the Ranier confession was involuntary."

We have carefully studied the testimony given by the appellant at the suppression hearing. It establishes quite clearly the chronology of the events of the evening of 23 September 1975. It does not conflict with the chronology of Cpl. Hall's testimony relating those same events. In outline, they went this way:

1. Pharr was arrested at his home by several police officers, and taken to the police station.

2. Cpl. Hall took Pharr into a room, where both sat at a desk.

3. Cpl. Hall read to Pharr from a paper, which pertained to his rights. He signed it.

4. Cpl. Hall and Pharr talked. Cpl. Hall was writing, on several sheets of paper.

5. When Cpl. Hall finished writing, he asked Pharr to sign his name on each sheet.

6. Pharr did not sign the pages at that time, but he did sign after Cpl. Hall told him he would talk to the clerk and see if he could get him personal bond.

It becomes clear that if that alleged promise induced Pharr to do anything, it did not induce him to confess. He had already done that. It was not a promise "held out to an accused for the purpose of inducing him to confess." *Smith v. State, supra.* The confession had been completed. It had been recorded in the handwriting of Cpl Hall. Whether Pharr signed his name on the pages, or declined to do so, had nothing to do with its voluntariness, or its admissibility. Nor did his testimony that he told the officer that he didn't know anything about any rape go to the issue of voluntariness.[4]

---

4. Fuzzy thinking is not, unfortunately, a stranger to the law, or to lawyers' arguments, or even to judicial opinions. The contentions here include a share of fuzziness. When one attacks a confession on the ground of voluntariness he is saying, in effect: "I did confess to the police that I committed the crime. The words written down there are indeed my words.

The facts of this case do not invoke the holding of *Mercer v. State, supra,* and of *Streams v. State, supra.*

We cannot help but attach significance to the content of the paper which was read to Pharr, and which he said he understood. He was told, "you are not promised anything to make a statement." He signed the waiver saying that he was willing to make a statement, and that no promises or threats had been made to him.

If one accepts, as we do, that Cpl. Hall read to Pharr what was printed on the paper, and that Pharr understood what it said, and agreed to the waiver, then one wonders if it is necessary thereafter to have Pharr sign still another paper saying, "I have not been promised anything to make a statement that I have not been promised anything . . . etc., etc., etc.,".

There was no error in the ruling of the lower court denying the motion to suppress Pharr's confession, and admitting it in evidence.

### The Handgun Charge

We agree with appellant's argument that the evidence was not sufficient to convict him on the charge of using a handgun in the commission of a crime of violence. His motion for judgment of acquittal on that count should have been granted.

The victim said that her assailant was holding a "silver handgun". He cocked and uncocked it several times, but did not fire it. Appellant's confession said that he had a silver blank gun. No gun was produced. The evidence did not show that the weapon Pharr used came within the statutory

---

But when I told them to the police, I was giving evidence against myself. When the police questioned me, I felt compelled to answer them. I did not know that I had a constitutional right against being compelled to give evidence against myself. Since I did not know of that right, I did not understandingly waive it. For that reason, my confession is deemed, constitutionally, to have been involuntary. Being involuntary, it may not be used against me. Its truth or falsity is irrelevant to its voluntariness."

On the other hand, if one attacks a confession on the ground that he did not say what the document records as having been said by him — that it is a forgery or otherwise a trumped-up document, then the question is simply whether the document is a true or a false record, and voluntariness is irrelevant.

definition of handgun. We shall reverse that conviction. *Howell v. State,* 278 Md. 389, 364 A. 2d 797 (1976); *Tisdale v. State,* 30 Md. App. 334, 353 A. 2d 653 (1976).

We have considered the additional arguments suggested by counsel at the express direction of the appellant. They have no merit.

> *Judgment on count charging use of a handgun in the commission of a crime of violence, reversed.*
> *Judgments on other counts affirmed.*
> *Appellant to pay costs.*