578 A.2d 810

**Ronald Gene WATTERS**

v.

**STATE of Maryland.**

**No. 1685, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Sept. 4, 1990.

Certiorari Granted Jan. 9, 1991.

---

Michael D. Montemarano, Assigned Public Defender, Baltimore, for appellant.

Audrey A. Creighton, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Davis R. Ruark, State's Atty. for Wicomico County, Salisbury, on the brief), for appellee.

Argued before BISHOP, ROSALYN B. BELL and WENNER, JJ.

ROSALYN B. BELL, Judge.

Ronald Gene Watters was convicted by a jury in the Circuit Court for Wicomico County, of first degree murder, assault with intent to murder, and assault and battery. He was sentenced to life imprisonment without the possibility of parole for the murder conviction. The other convictions were merged. On appeal Watters contends that the trial court erred:

—in denying his motion for mistrial, and

—in refusing his motion to suppress certain statements.

We conclude no error occurred.

## FACTS

On the evening of June 7, 1988, Lisa Taylor stopped at her parents' house after work to pick up some checks for her college tuition. After a short visit, she left to return to her apartment. Two days later, it was discovered that Taylor had never returned to her home. More than three months later, a badly decomposed body was found in a

wooded area near the campus of Salisbury State University. A comparison of dental records revealed that the body was that of Lisa Taylor. Dr. Margarita Korell testified that the cause of death was by an obstruction of the airway as a result of a smock forced into the larynx and pharynx area of the throat. The police had no suspects and developed no leads in solving the homicide.

On December 1, 1988, however, Watters, while being held at the Wicomico County Detention Center on unrelated charges, asked to speak to the police. In a series of interviews with the police, Watters made statements implicating himself in the Taylor homicide. Watters was subsequently charged with various offenses stemming from the murder of Taylor.

## MISTRIAL

Appellant complains that he was denied his Sixth Amendment right to a public trial as a consequence of the denial of public access to voir dire proceedings. Hence, he concludes that the trial court erred in not granting his motion for a mistrial.

After returning from a lunch recess on the first day of trial, defense counsel alerted the court that he would move for a mistrial. Counsel had learned that, during the morning proceedings at the time prospective veniremen were being voir dired, members of the sheriff's department had unilaterally excluded members of the public from the courtroom. This included members of appellant's family and members of the news media.

The court then allowed the examination of T.A. Phillips, the deputy sheriff. The following exchange took place:

"BY [APPELLANT'S COUNSEL]:

\*    \*    \*    \*    \*    \*

"Q   Okay. Were you authorized or instructed to keep spectators, members of the public and/or news media outside the courtroom?

"A   No, sir.

"Q   Are you aware that that was followed?

"A   Yes, sir, it was.

"Q   And by who was that followed?

"A   By myself.

"Q   You say no one instructed you, is that correct?

"A   No, sir.

"Q   You took it upon your own to exclude spectators and members of the news media?

"A   Yes, sir.

\*     \*     \*     \*     \*     \*

"Q   Who was excluded, to your knowledge?

"A   The only persons allowed in the courtroom were those on jury duty and those as witnesses in the trial pending before the Court.

"Q   Are you aware of how many civilian spectators, members of the public, news media personnel attempted to gain entrance into the courtroom this morning for the proceedings?

"A   No, sir.

"Q   Again, on whose authority did you exclude members of the public and members of the media?

"A   On my own.

"Q   And what authority did you have to do that?

"A   Just my own.

"THE COURT: He is in charge of courtroom security.

"BY [APPELLANT'S COUNSEL]:

"Q   Did you ask the advice or consent of either myself, [the Assistant State's Attorney], or the administrative judge of the Circuit Court for [Wicomico] County before you made that decision?

"A   No, sir."

Appellant's counsel then asked Phillips what instructions he had given the deputy who had screened entrance into the courtroom. This colloquy occurred:

\*     \*     \*     \*     \*     \*

"THE WITNESS: To allow only jurors and witnesses in the case to enter the courtroom.

"BY [APPELLANT'S COUNSEL]:

"Q   Did you instruct him as to why?

"A   Because of the nature of the number of people involved in the case and the courtroom would not handle all the persons who wanted to get into the courtroom.

"Q   Now, the courtroom, every seat in the courtroom was not filled this morning, is that correct?

"A   There were some seats.

"Q   Can you estimate for us how many you believe were available?

"A   No, sir, I can't."

On cross-examination, the State asked:

"Q   Deputy Phillips, very briefly, the individuals you asked not to come into the courtroom, to the best of your knowledge were they on both sides of the case, spectators for both sides, as opposed to either the defense or the state?

"A   I have no way of knowing that.

"Q   It was an across-the-board type of thing, is that correct?

"A   Yes, sir.

"Q   I have nothing further, Your Honor."

Appellant's mother then testified that she and other family members were denied access into the courtroom that morning.   Appellant renewed his motion for a mistrial and the court ruled:

"It was done as a matter of Court security because of the crowded conditions of the courtroom, and it is not denying him his right to a public trial.   The motion is denied."

In support of their respective positions, both the State and appellant rely on *Press–Enterprise Co. v. Superior Court of California, Riverside County,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), which held that the guarantees of open public proceedings in criminal trials cover the voir dire proceedings.   In addressing this question, the

United States Supreme Court focused on First Amendment values. *Press–Enterprise Co.*, 464 U.S. at 509 n. 8, 104 S.Ct. at 823 n. 8.[1]

Unlike *Press–Enterprise Co.*, the question we have before us focuses on the Sixth Amendment, rather than the First Amendment. In *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), however, the United States Supreme Court noted that "there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." *Waller*, 467 U.S. at 46, 104 S.Ct. at 2215. The Court went on to say:

"Under *Press–Enterprise*, the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure."

*Waller*, 467 U.S. at 48, 104 S.Ct. at 2216.

The problem here is that no request was made by either party to exclude the public from the courtroom. Hence, the trial judge was not confronted with balancing an overriding interest against the right to public access or given an opportunity to consider alternatives. Instead, he was faced with a determination of whether the unilateral actions of the sheriff rose to the level of a constitutional deprivation.

Although we have never addressed this precise issue, some of our sister jurisdictions, when confronted with similar circumstances, have held that the defendant's right to a public trial was not denied. In *State v. Brooks*, 92 Mo. 542,

---

**1.** The Sixth Amendment right to a public trial has been held to include the impaneling of the jury. *See e.g., United States v. Sorrentino*, 175 F.2d 721, 722 (3d Cir.) *cert. denied*, 338 U.S. 868, 70 S.Ct. 143, 94 L.Ed. 532, *rehearing denied*, 338 U.S. 896, 70 S.Ct. 238, 94 L.Ed. 551 (1949); *State v. Lawrence*, 167 N.W.2d 912, 915 (Iowa 1969); *State v. Pullen*, 266 A.2d 222, 228 (Me.1970), *overruled on other grounds, State v. Brewer*, 505 A.2d 774 (Me.1985).

5 S.W. 257, 330 (1887), *error dismissed*, 124 U.S. 394, 8 S.Ct. 443, 31 L.Ed. 454 (1888), *overruled on other grounds, State v. Imboden*, 157 Mo. 83, 57 S.W. 536 (1900), *overruled on other grounds, State v. Hathhorn*, 65 S.W. 756 (1901), two men stationed at the entrance of the courtroom refused to admit anyone into the courtroom except jurors, witnesses and officers of the court during the impaneling of the jury. The exclusion only continued through the afternoon of one day and the morning of the next day. When the matter was brought to the court's attention, it stated that no order had been made stationing men at the door and then announced that anyone who wished to come into the courtroom could do so until the seats were filled. On appeal, no violation of the defendant's right to a public trial was found. *Brooks*, 5 S.W. at 263–64.

Similarly, in *Snyder v. Coiner*, 510 F.2d 224 (4th Cir. 1975), the bailiff refused to allow persons to enter or leave the courtroom during counsels' arguments to the jury. The exclusion lasted a short time and was changed by the trial judge when advised of the bailiff's actions. The Fourth Circuit stated that the incident was "entirely too trivial to amount to a constitutional deprivation." *Snyder*, 510 F.2d at 230.

In *Commonwealth v. Burton*, 459 Pa. 550, 330 A.2d 833 (1975), the district attorney, without the trial court's knowledge, requested court personnel to keep the defendant's wife and all members of the Black Panthers out of the courtroom during the testimony of a witness. Pursuant to the district attorney's request, other members of the defendant's family were also accidentally excluded. When the defendant's counsel became aware of what occurred, he moved for a mistrial, claiming that the defendant was deprived of his right to a public trial. After the trial judge was made aware of the situation, he ratified the district attorney's action, excluding the defendant's wife and the Black Panthers. He did, however, permit the admission of the rest of the defendant's family. The Supreme Court of Pennsylvania held that under those circumstances the de-

fendant was not denied the right to a public trial. *Burton,* 330 A.2d at 837.

■ We find these cases persuasive in the resolution of the question which appellant presents. As in the above cases, the exclusion of the public in the instant case was for a short time. In addition, there was no evidence of favoritism or partiality as to who was prohibited from entering. Moreover, as far as we can determine, the public was not excluded from the trial itself, but only from the voir dire proceeding. In view of the intense publicity surrounding the trial, access to the courtroom undoubtedly raised the potential of overcrowding. In light of this potential, Phillips took it upon himself as head of security to limit entry into the courtroom to only prospective jurors and witnesses. Although this type of unilateral action by the sheriff is not appropriate, we do not find that appellant was denied his Sixth Amendment right of a public trial by this action. We explain.

■ The requirement of a public trial benefits the accused in that the public may see that the defendant is dealt with fairly, thus avoiding the appearance of a "Star Chamber" proceeding. *Dutton v. State,* 123 Md. 373, 387–88, 91 A. 417 (1914). This right of a public trial, however, is subject to the trial judge's discretion to exclude members of the public from the trial where no prejudice to the accused results. *Dutton,* 123 Md. at 387, 91 A. 417; *Cox v. State,* 3 Md.App. 136, 139–40, 238 A.2d 157 (1968). But an accused who invokes the constitutional guarantee of a public trial should not be required to prove specific prejudice in order to show a violation of the public trial right. *Waller,* 467 U.S. at 49–50, 104 S.Ct. at 2217, and cases cited therein. *See also* Annotation, *Exclusion of Public During Criminal Trial,* 48 A.L.R.2d 1436, 1454 (1956). This is so because it would be difficult, if not impossible, for the accused to point to any specific injury. *United States v. Kobli,* 172 F.2d 919, 921 (3d Cir.1949). To require the accused to prove specific prejudice would, ironically, impose the necessity to

prove what the disregard of one's constitutional right has made it impossible to learn. *United States ex rel. Bennett v. Rundle,* 419 F.2d 599, 608 (3d Cir.1969). We agree with and thus adopt this view. With these precepts in mind, we proceed to examine appellant's claim of error.

Ordinarily, in a criminal case, the trial judge may exclude persons having no connection with the trial to the extent such exclusion is necessary to prevent overcrowding. *See* Annotation, 48 A.L.R. 2d at 1449; Annotation, *Exclusion of Public from State Criminal Trial in Order to Prevent Disturbance by Spectators or Defendant,* 55 A.L.R. 4th 1170, 1176 (1987).

In this case, the exclusion of the public should have been brought to the trial judge's attention prior to the voir dire. He found, however, that the potential for overcrowding was present and this justified the temporary exclusion since no reasonable alternative existed. We cannot hold that the trial judge abused his discretion in finding that the circumstances presented did not rise to a level that constituted a denial of appellant's Sixth Amendment rights. The exclusion of the public was of short duration and was corrected when the trial judge became aware of the situation.

The fact that appellant's family was excluded along with others during the voir dire does not alter our opinion. Although the accused is generally entitled to have his or her family present in the courtroom, *In re Oliver,* 333 U.S. 257, 271–72, 68 S.Ct. 499, 506–07, 92 L.Ed. 682 (1948), under the circumstances presented here, we cannot say that their exclusion warranted a mistrial. As was previously mentioned, the exclusion was nondiscriminatory in application and short in duration. Moreover, the family was permitted to enter once the trial judge was informed of what occurred.

The decision to grant or deny a mistrial is within the sound discretion of the court and the motion should not be granted except under extraordinary circumstances and where there is a manifest necessity. *Russell v. State,* 69 Md.App. 554, 562, 518 A.2d 1081 (1987). We perceive no

manifest necessity for a mistrial under the circumstances in the instant case.

## SUPPRESSION

Appellant contends that the trial court erred in denying his motion to suppress his inculpatory statements. He claims that his statements were neither voluntarily nor intelligently and knowingly made.

■ He presents two arguments in support of this contention. First, he argues that although he asserted his Sixth Amendment right to counsel before making the statements, he was denied access to his attorney. Secondly, he argues that he was induced to confess.

In accordance with *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), a person subjected to custodial police interrogation must be advised of his or her right to counsel. If the accused requests the presence of counsel, no further interrogation is allowed until counsel is made available. *Miranda,* 384 U.S. at 444–45, 86 S.Ct. at 1612–13; *see also Bryant v. State,* 49 Md.App. 272, 277, 431 A.2d 714, *cert. denied,* 291 Md. 772, 782 (1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982).

Here, the trial court found and the record corroborates that appellant initiated the contact and conversations with the police regarding information on the Taylor homicide. In *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612, the United States Supreme Court defined "custodial interrogation" as questioning initiated by law enforcement officers. Since appellant sought the discussion, he was not entitled to *Miranda*'s protection.

Even if he were, the record reflects that appellant was repeatedly informed of and understood his right to counsel before any statements were taken. Detective Roberts of the Wicomico County Sheriff's Department and Trooper Roberts of the Maryland State Police advised appellant of his *Miranda* rights and obtained his signature on a waiver

form at the State police barracks in Salisbury after his December 1 request to talk to them. At that time, no specific questions were asked of appellant regarding the homicide as appellant asked to be returned to his cell at the Detention Center. After returning to the Detention Center, appellant again requested to talk to Detective Roberts. Appellant was transported back to the State police barracks where he was advised of his *Miranda* rights by Trooper Roberts and Detective Roberts. Detective Roberts tape recorded the reading of appellant's constitutional rights, including his right to the advice of counsel. Appellant indicated that he understood his rights and signed the waiver form.

On December 2 and 6, 1988, Corporal Collins, the State police polygraph examiner, testified that he advised appellant of his constitutional rights before administering a polygraph test. Appellant advised Collins that he understood his rights and signed the waiver form. At no time during any of these interviews did appellant indicate any desire to obtain or speak to an attorney. Hence, we find no merit to appellant's argument.

■ Appellant next argues that his statements were involuntary since the police made false promises to induce him to confess. Specifically, he alleges that Detective Roberts and Trooper Roberts indicated that they would help him in getting released from jail if he helped the police in solving the Taylor case. Both officers, however, related that at no time were any promises made regarding leniency with respect to the Taylor homicide or other charges facing appellant. Corporal Collins also averred that no promises or inducements were made in his presence to try to get appellant to make a statement.

In addition, the tape recorded interview of appellant on December 1, 1988 corroborates the officers' testimony. On the tape, Detective Roberts said to appellant:

"You want to get out of jail. You know we can't make any promises, okay? You know that. We don't make

any deals, no promises, and we haven't made you any deals or promises."

Appellant responded affirmatively. The tape further revealed the following exchange between Detective Roberts and appellant:

"Question: You are looking for some kind of deal, is that what you are—okay, we can't make you any deals or promises and we can't make you nothing. If there is more you want to tell us, we are here to listen, but we can't make any deals or promises.

"Answer: That is the whole point.

"Question: We are not in the position that we can make the deals, [appellant].

"Answer: I know. I know you—I know.

"Question: The State's Attorney is the only—is the only one that can do anything like that. We can't do that."

Reading from the transcript of the taped interview, Detective Roberts further reported:

"And on page 29, [appellant] says I know, I understand that you ain't in that position. You know it is just like you to say—you know, it is just like you—it is just like you say, it is more I want to tell you, but I just want to get out first.

"The next question is well, [appellant], I am telling you—what I am telling you is that I can't promise that you are going to walk out of jail, okay? Neither one of us can promise you that. I just can't do that, man, I can't promise you that you are going to walk out of that jail, all right? I am giving you the opportunity to tell us what you know, to tell us what you know. I can't say whether that is going to help you, I can't say it is not going to help you, because I am not in that position."

Based on the testimony elicited at the suppression hearing, the motions judge simply did not believe appellant and concluded that the statements were made voluntarily. We

cannot say this ruling was clearly erroneous. Rule 8–131(c).

In *Pharr v. State,* 36 Md.App. 615, 628, 375 A.2d 1129, *cert. denied,* 281 Md. 742 (1977), we stated that the State must prove that the confession was made voluntarily and not the product of force, threats, promises, or inducements. We added that to be voluntary a statement cannot be extracted by any direct or implied promises, however slight, nor by the exertion of any improper influence. *Pharr,* 36 Md.App. at 628, 375 A.2d 1129. Here, the trial court determined that the State established by a preponderance of the evidence that there were no inducements and found that the statements were voluntary. Our independent and reflective review of the record supports that finding and we do not conclude it to be clearly erroneous. We perceive no error.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.