JOHN BERNARD KELLER, JR. *v.* STATE
OF MARYLAND

[No. 309, Initial Term, 1967.]

*Decided December 15, 1967.*

624

The cause was argued before MURPHY, C. J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Joseph Forer* for appellant.

*Fred Oken, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *John Henry Lewin, Jr., Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

The appellant, John Bernard Keller, Jr., was found guilty of soliciting to commit mayhem by Judge Thomas J. Keating, Jr., sitting as court and jury in the Circuit Court for Queen Anne's County on September 21, 1966, and sentenced to ten years in the Maryland Penitentiary. His sole contention on this appeal is that two confessions, which he gave police while in their custody, were improperly admitted in evidence at the trial over his timely objection.

The facts are essentially undisputed and show that Carvel Kenneth Hatfield was shot to death on August 26, 1965 by an assailant with a .22 caliber revolver, which was subsequently found near the scene of the crime. One month later, on September 26, 1965, at about 12:45 a.m., the appellant, then twenty-two years of age, and possessed of something between a sixth and ninth grade education, was arrested without a warrant by six Baltimore City police officers, brought to Central Police Headquarters and without being advised of his right to counsel was interrogated about the crime from 1:15 a.m. to 4:45 a.m. He made no statement at that time. At 7:13 p.m. interrogation was resumed, during which Lieutenant Anton Glover, the interrogating officer, told Keller that the police were aware that he did not murder Hatfield. but that if "he told us what he

knew we would take it up with the State's Attorney and would elect to use the Defendant as a witness." The appellant then asked to have a few minutes to himself to consider the matter.

At approximately 9:30 p.m., appellant agreed to tell the police "what happened." At 9:45 p.m., attorneys Martin Ferris and Thomas Bracken arrived at Central Police Headquarters to see Keller, their presence resulting from appellant's phone call to a friend, Guido Iozzi—a phone call which he was permitted to make just prior to the 7:13 p.m. interrogation. The police began taking appellant's statement at 10:00 p.m., and had progressed to a point where Keller had just answered "yes" to the inquiry of whether he knew anything about how Hatfield met his death, when at 10:08 p.m., Ferris entered the room to see Keller, and the interrogation was halted. Although not entirely clear from the record, it appears that Ferris was kept waiting, unable to see his client, until this time, since Glover apparently had been informed of his arrival at 9:45 p.m. Ferris was not then told that the appellant's statement was being taken. He conferred with Keller until about 10:30 p.m., advising him before leaving to make no statement to the police. Upon Ferris's departure, Lieutenant Glover reassured appellant that he could be used as a State's witness, and Keller agreed to finish his statement. The record indicates that Glover conferred with Deputy State's Attorney George Helinski sometime that evening and that he received permission to use Keller as a State's witness, if such a course would be beneficial to the police.

On the next day, Monday, September 27, 1965, Lieutenant Glover informed Ferris that Keller had made a statement but that the police felt that it was inaccurate; and that if Keller would tell the true story, he, Glover, was still willing to use him as a State's witness. Ferris conferred with his client on Monday at about 10:00 a.m., at which time Keller told Ferris to tell Iozzi that he had agreed to turn State's witness against Jack Lawlor, whom he had identified in his statement as the man who had paid him to get someone to "rough up" Hatfield. Ferris then advised Keller fully with respect to his predicament, including the possibility that his statement would not constitute admissible evidence, and that should he decide to become a

State's witness, he would have to cooperate fully with the authorities. Keller told Ferris that he wanted time to think over the matter. In the meantime, Glover had discussed with Helinski the possibility that Keller would make a new statement.

On the afternoon of Tuesday, September 28, 1965, Ferris again saw Keller, who informed him that he wished to be a State's witness, that he would tell the entire story, and that he wanted Ferris to work out an arrangement whereby he would not be prosecuted. Ferris then called Helinski at his office, and concluded an agreement over the phone, after which Ferris came to Helinski's office, where, with Glover present, they agreed that Keller would not be prosecuted if he would give a truthful written statement to the satisfaction of the police, sign it, and testify for the State, both before the grand jury and at the trial. Glover and Ferris then returned to police headquarters and, at 3:35 p.m., the second statement was taken from appellant. Although substantially the same as the first statement, the second statement identified Guido Iozzi, rather than Jack Lawlor, as the person who procured Keller to arrange for the assault on Hatfield. After the second statement was taken, but before it was signed, Glover and Ferris returned to Helinski's office, because Ferris wanted further assurances that Keller would be used as a State's witness, and would not be prosecuted. Reassured, Ferris instructed the appellant to sign the statement, which he did at 6:15 p.m.

Keller appeared against Iozzi before a Grand Jury, but refused on self-incrimination grounds to testify at Iozzi's conspiracy trial. Following Iozzi's acquittal, Keller was indicted and, as heretofore indicated, convicted of soliciting to commit mayhem, his confessions being received in evidence against him at his trial.

Appellant contends that both statements were involuntary, being the product of inducement and hence inadmissible in evidence at his trial.

The basic standard governing the admissibility of an extra-judicial statement is whether, considering the totality of the circumstances, the statement was voluntary. *Clewis v. Texas,* 386 U. S. 707; *Taylor v. State,* 238 Md. 424; *McFadden v. State,* 1 Md. App. 511. To be voluntary, a statement cannot be "ex-

tracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Malloy v. Hogan,* 378 U. S. 1, 7.[1] The Maryland test of voluntariness, developed from common law principles, has long been equally stringent, if not more so. In *Biscoe v. State,* 67 Md. 6, the Court of Appeals enunciated the test governing the admissibility of confessions, at page 7, as follows:

> "* * * whether it was a free and voluntary confession, or whether it was procured by the influence of another under a hope of favor or advantage if made, or fear of harm or disadvantage of some kind if withheld. * * *."

The burden upon the State to establish voluntariness as a prerequisite to the admission of a confession was reiterated in *Cox v. State,* 192 Md. 525 at page 536 as follows:

> "* * * before a confession is admissible in evidence the State must show to the satisfaction of the trial judge that it was freely and voluntarily made by the accused, that no force or coercion was exercised to obtain the confession, and that no hope or promise of reward was held out to the accused for the purpose of obtaining it. * * *."

More specifically, the Court of Appeals has held that the State must prove that the statement "was not the product of force or of a promise, threat or inducement whereby the accused might be led to believe that there would be a partial or total abandonment of prosecution." *Abbott v. State,* 231 Md. 462, 465; *Bean v. State,* 234 Md. 432, 439.

Under these tests, it is abundantly clear that appellant's initial statement was improperly admitted into evidence. Keller had refused to say anything during the three hour interroga-

---

1. This test was first applied in Bram v. United States, 168 U. S. 532, being based on the Fifth Amendment privilege against self-incrimination, which Malloy makes applicable to the States through the Due Process Clause of the Fourteenth Amendment.

tion session immediately following his arrest. At the next stage of questioning, however, Lieutenant Glover indicated to Keller in no uncertain terms that if he confessed, he would be used as a State's witness and granted immunity from prosecution. As a direct result of this inducement, the appellant agreed to make a statement. By the time Ferris, appellant's attorney, was allowed to see him, Keller had already indicated that he knew "what happened" and had begun making a statement, in the course of which he stated that he had knowledge of "how Carvel Kenneth Hatfield met his death." Ferris was not then told that a statement was being taken, and when he left, Glover renewed his offer, presumably on the strength of an agreement with Deputy State's Attorney Helinski, and Keller agreed to finish the statement in spite of the advice of his counsel to make no statement. Under these circumstances, we hold that appellant's first statement was the product of a promise or inducement made by Lieutenant Glover whereby directly within the rationale of *Abbott* and *Bean,* the accused might be led to believe that there would be a partial or total abandonment of prosecution. As such, the statement was involuntary and thus improperly admitted into evidence at the trial.[2]

The admissibility of appellant's second statement presents a more difficult problem since it was given after consultation with very able counsel who, with consummate skill, had negotiated a highly advantageous agreement with the State, whereby appellant would not be prosecuted in return for his cooperation as a State's witness. Had this statement not been made against the compelling background which produced the first confession, we would find it admissible in evidence, as representing the quintessence of voluntariness. We hold, however, that the second statement cannot under the circumstances here present be separated from the first, the inducement for the second statement being essentially an extension of that made for the first, and undoubtedly necessitated by the fact that Keller had already made a statement which, though partly untrue, thoroughly

---

2. In so concluding, we find it unnecessary to decide the further question presented by appellant as to whether his first statement was inadmissible in light of Miranda v. Arizona, 384 U. S. 436.

implicated him in the crime. In permitting Keller to make the second statement, and in negotiating the arrangement for immunity, Ferris was but making the best of a situation created by appellant's initial confession.

It is clear to us that there was "no break in the stream of events" so as to render appellant's second confession free from the taint of the first. See *Clewis v. Texas, supra* p. 710; *Beecher v. Alabama*, 389 U. S. 35, 19 L. Ed. 2d 35, 39. The Supreme Court stated the general proposition in *United States v. Bayer*, 331 U. S. 532, at page 540 as follows:

> "Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. * * *."

The court held in *Bayer*, however, that an earlier confession did not render one obtained six months later automatically inadmissible, where the only restraint on the accused in that case was that he was not to leave the military base to which he was assigned during the period between the two confessions.

In contrast, Keller's second statement was taken less than forty-eight hours after the first, and he remained in jail during that entire time. We hold that under these circumstances the original inducement continued to influence appellant's mind, and the taint of his initial confession was not so dissipated as to render his subsequent confession free and voluntary. Accordingly, appellant's second statement was, like the first, involuntary and inadmissible, and its admission into evidence by the court below constituted prejudicial error.

*Judgment reversed: case remanded for a new trial.*