510 A.2d 599

**Leon Michael YOUNG, Jr.**

v.

**STATE of Maryland.**

**No. 473, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

July 3, 1986.

Certiorari Denied Nov. 5, 1986.

Robert L. Pierson, Assigned Public Defender, Alan H. Murrell, Public Defender, on brief, Baltimore, for appellant.

Jillyn K. Schulze, Asst. Atty. Gen., Stephen H. Sachs, Atty. Gen., Baltimore, Andrew L. Sonner, State's Atty. and Jack Hanly, Asst. State's Atty. for Montgomery County, on brief, Rockville, for appellee.

Argued before GILBERT, C.J., and GARRITY and KAR-WACKI, JJ.

GARRITY, Judge.

In appealing his convictions of first degree murder and robbery, Leon Michael Young, Jr., asks us to review the admissibility of his confessions made after a lengthy series of police interrogations.

### Background

At Young's trial, his friend Lawrence Hart testified that Young had telephoned Janet Bogan on the morning of February 17, 1984. Disguising his voice as that of an acquaintance, Young invited Bogan to his home in Montgomery County with the avowed purpose of "getting high," apparently with the assistance of cocaine. After Ms. Bo-

gan's arrival, Young forced her at knifepoint to remove her clothes and engage in a variety of sexual acts. Fearing that she would report his bizarre behavior, Young bound his victim's hands behind her back, placed her face down on the floor, wrapped his belt around her neck, put his foot on her back, and pulled on the belt until she could no longer breathe. Young then replaced the dead woman's clothes and removed her ring. He later discarded her body in a park located in Prince George's County and pawned the ring.

Hart explained at trial that his testimony was a recitation of Young's recounting of his own acts. Indeed, Hart had been so troubled by the story that he had almost immediately telephoned Crime Solvers, Inc. This telephone call, in turn, led to a police investigation which recovered both the victim's body and ring at the places identified by Hart.

On February 23, 1984, Young was arrested at his place of employment in Montgomery County. While still in police custody the next day, and after several rounds of interrogation, Young twice confessed to the murder and robbery of Janet Bogan.

Subsequent to the denial of a motion to suppress his confessions, a jury in the Circuit Court for Montgomery County (Beard, J., presiding) found Young guilty of first-degree murder and robbery. Young received a sentence of life imprisonment for the murder and a consecutive ten-year term for the robbery.

The appellant raises four issues for our review. The first three are challenges to the denial of his motion to suppress his inculpatory statements. First, he contends the confessions were involuntary; second, he claims that he did not receive a proper recitation of his right to an attorney; and third, he claims that his request for an attorney was ignored. The fourth issue the appellant raises is whether the trial court erred in not giving a requested jury instruction cautioning the jury against attaching undue credibility to the testimony of police officers. Because we here decide

that it was error to admit Young's inculpatory statements made to the police, we need not consider the appellant's second and third issues. We shall discuss the fourth issue raised by the appellant, since it may be pertinent to a new trial.

### Confessions to Police—Facts

According to evidence adduced at the suppression hearing, at 12:09 p.m. on February 23, 1984, Corporal F.M. McQuillan of the Prince George's County Police, pursuant to a warrant, arrested Leon Michael Young, Jr., at his place of employment in Silver Spring, Maryland. McQuillan transported Young to police headquarters in Prince George's County, arriving at approximately 12:45 p.m. At this time, McQuillan placed Young in an interrogation room and handcuffed him to a three-foot chain attached to the floor. McQuillan provided Young with a cigarette and a soda. He informed Young that he was under arrest for the murder of Janet Bogan. He also advised the accused of his right to remain silent and his right to an attorney. While Young refused to sign a Waiver of Rights form, he indicated to McQuillan that he would cooperate. With no one else in the room, the police officer interrogated his prisoner continuously until 5:45 p.m.

According to McQuillan, the suspect remained calm and appeared sober throughout the questioning. Further, Young never requested food, drink, nor permission to visit the bathroom throughout this period. McQuillan testified that he made neither promises nor inducements to get Young to talk with him. Throughout this interrogation, Young maintained his innocence.

At about 6:00 p.m., Detective John SanFelice replaced McQuillan in the interrogation room. SanFelice also advised Young of his rights. Again, Young refused to sign a Waiver of Rights form but agreed to discuss the matter. SanFelice told Young that the police had received an anonymous tip from a phone caller, who claimed that Young had murdered Janet Bogan and pawned her ring. SanFelice

related to Young that the police had gone to the pawn shop described by the informant and recovered the ring. Young then identified the informant as his friend, Hart. The interview lasted until 7:00 p.m., when SanFelice left the room to speak with the informant, who had again called the station. SanFelice also testified that Young remained calm and attentive throughout the interrogation.

Detective Jeffrey A. Krauss, who was in charge of the investigation, replaced SanFelice in the room at about 7:15 p.m. Krauss never questioned Young about the murder. According to his testimony, the police officer merely sought general information about Young in order to complete certain forms. Young requested that Krauss let him use the bathroom, and Krauss complied. Krauss left Young's presence at about 7:40 p.m.

Detective Michael G. Ferriter entered the interrogation room at approximately 7:45 p.m. and advised Young of his rights. As in the prior interrogations, Young refused to sign the waiver form but agreed to cooperate. Detective Ferriter then turned on a tape recorder so that Young could hear Hart's statement. Young continued to make exculpatory statements; however, he did admit that the pawn shop receipt for Janet Bogan's ring bore his signature. Ferriter suggested to Young that, while Young had not intended to murder Ms. Bogan, "kinky" sexual activity between Young and Ms. Bogan had led to her accidental death. Ferriter also suggested to Young that the murder may have resulted from the victim's demand for money or drugs. Ferriter explained to the court that he presented these scenarios to Young "to give him an out."

Young thereupon told Ferriter that he had discovered Janet Bogan's ring in his bathroom after the two had engaged in sex. He conceded that, after learning of Bogan's death, he had pawned her ring. As to the murder, however, Young maintained his innocence.

At approximately midnight, Corporal Larry D. Bowman of the Prince George's County Police Department removed

Young from the interview room for processing. Bowman then presented Young to the District Court Commissioner's office in Upper Marlboro, Maryland.

Commissioner Gary Filmore advised the accused of his rights, and Young signed the form acknowledging his understanding of them. Young indicated on the form that he would provide his own counsel. Pursuant to specific orders from the Prince George's County District Court's Administrative Judge Graydon S. McKee, III, the Commissioner committed Young to the Montgomery County Detention Center and directed Officer Bowman to take the prisoner to that facility. Instead, Bowman, following orders from Detective Krauss, returned Young to the police station in Prince George's County.

Detective SanFelice visited Young in the interrogation room at 1:45 a.m. SanFelice asked Young if he had changed his mind and was now willing to talk. SanFelice showed Young a typed statement made by the informant, Hart. SanFelice then left Young with the statement and went out to prepare a search warrant. The detective advised Young that until the search warrant was served, he would not be allowed to make any telephone calls.[1] According to the police officer's testimony, he continued to check on his prisoner throughout the night by means of a "peephole in the door." Though handcuffed, Young "appeared" to sleep in a chair during the night. There was no cot or bed in the room. SanFelice entered the room at approximately 7:30 a.m. and asked Young if he needed to eat. Young rejected the offer but requested and received a cigarette and permission to use the bathroom.

At approximately 8:15 a.m., Detective Garland D. Price went into the interrogation room. Price asked Young if it were okay "if I talked to him in reference to the case and he said he didn't mind." Price thereupon advised Young of his

---

1. The search of appellant's house was executed between 10:45 a.m. and 2:00 p.m. on February 24, 1984.

"Miranda rights." Price testified that Young appeared alert, cooperative, and in excellent physical health. Initially, Young made several exculpatory statements. At approximately 10:00 a.m., after his second cigarette, Young began to make inculpatory remarks. Finally, he made a full confession, describing in detail the events leading up to the murder and his commission of the crime. At 11:30 a.m., Detective Price left the interrogation room and obtained food for Young upon his request.

At approximately 2:30 p.m., Detective Ferriter entered the room. Although Young refused to sign a Waiver of Rights form, he reiterated to Ferriter his earlier inculpatory statements.

Prior to trial, Young moved to suppress police testimony as to those inculpatory statements. The motion was denied, and Detectives Ferriter and Price related Young's confessions to the jury. In essence, the confessions paralleled Hart's statement.

### I. *Confessions to Police—Admissibility*

#### A. *The Tests*

The issue is whether it was error to allow the police officers to testify as to the inculpatory statements made by their prisoner. There are two separate tests for the admissibility of confessions, and they are from two separate sources. One is the Maryland common law, and the other is federal constitutional law.

For over 100 years, the Maryland Court of Appeals has "attempted to delineate and clarify the boundary between that of proper police conduct from that of improper police conduct." *Bellamy v. State,* 50 Md.App. 65, 75, 435 A.2d 821 (1981). This "traditional" test is whether the confession was obtained without force, coercion, or the holding out of any promise. *Lodowski v. State,* 302 Md. 691, 715, 490 A.2d 1228 (1985), vacated and remanded, —— U.S. ——, 106 S.Ct. 1452, 89 L.Ed.2d 711 (1986). *Scott v. State,* 61 Md. App. 599, 602, 487 A.2d 1204 (1985); *Pharr v. State,* 36 Md.App. 615, 627–28, 375 A.2d 1129 (1977); *Greenwell v.*

*State*, 32 Md.App. 579, 583, 363 A.2d 555 (1976); *Keller v. State*, 2 Md.App. 623, 627, 236 A.2d 313 (1967). In such cases, the State has the burden of showing by a preponderance of the evidence that the defendant voluntarily confessed. *See, e.g., Lodowsky*, 302 Md. at 715, 490 A.2d 1228; *Pharr*, 36 Md.App. 615, 627, 375 A.2d 1129.

The United States Constitution, specifically the Fifth and Sixth Amendments, applied to the states under the Fourteenth Amendment, impressed procedural safeguards on the traditional test of voluntariness. As in the traditional approach, we must make an independent review of the record to decide whether, in light of the "totality of the circumstances," a confession was voluntary and, therefore, admissible. *Lodowsky*, 302 Md. at 711, 490 A.2d 1228; *Scott*, 61 Md.App. at 605, 487 A.2d 1204; *Finke v. State*, 56 Md.App. 450, 487, 468 A.2d 353 (1983); *Greenwell*, 32 Md.App. at 587, 363 A.2d 555.

Although we must, if possible, decide this case on Maryland common law principles, *see Scott v. State*, 289 Md. 647, 651, 426 A.2d 923 (1981); *Simms v. State*, 288 Md. 712, 725, 421 A.2d 957 (1980) [cases collected]; *Hillard*, 286 Md. at 150, n. 1, 406 A.2d 415; *Comptroller v. Crown Central Petroleum*, 52 Md.App. 581, 597, 451 A.2d 347 (1982), we are guided by cases decided on both constitutional grounds and on Maryland common law principles. The federal law in this area stems from that portion of the Fifth Amendment to the Constitution commanding that no person "shall be compelled in any criminal case to be a witness against him or herself." *Lodowsky*, 302 Md. at 716, 490 A.2d 1228. As constitutional principles developed from Supreme Court decisions, they now control state action through the Fourteenth Amendment. *See Carter v. Kentucky*, 450 U.S. 288, 295–303, 101 S.Ct. 1112, 1116–20, 67 L.Ed.2d 241 (1981); *Hurtado v. California*, 110 U.S. 516, 538, 541–42, 4 S.Ct. 111, 28 L.Ed. 232 (Harlan, J. dissenting); *see also Escobedo v. Illinois*, 378 U.S. 478, 490–91, 84 S.Ct. 1758, 1764–65, 12 L.Ed.2d 977 (1964); *Gideon v. Wainwright*, 372 U.S. 335, 342, 83 S.Ct. 792, 795, 9 L.Ed.2d 799 (1963) ("[A] provision

of the Bill of Rights which is 'fundamental and essential to a fair trial' is made obligatory upon the States by the Fourteenth Amendment.").[2]

As noted, the appellant contends that his confessions were not admissible at trial because they were the product of coercion and, therefore, involuntary. Specifically, he lists as factors: the considerable length of his custody; the length of the interrogations; the absence of rest; the fact that one officer would relieve another to continue the interrogations; the delay in presenting him to the Commissioner; his return to the station after appearing before the Commissioner; his confinement in unfamiliar surroundings; and, similarly, his being held incommunicado. We shall address those factors most pertinent to our determination in light of the totality of the circumstances surrounding Young's confessions.

### 1. *Method of Interrogation*

Our focus is on the police conduct during the period that Young was held in custody. In its landmark decision of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1964), the United States Supreme Court made the following observation of police practices as prescribed in official police manuals:

> To highlight the isolation and unfamiliar surroundings, the manuals instruct the police to display an air of confidence in the suspect's guilt and from outward appearance to maintain only an interest in confirming certain details.

---

**2.** The only significant difference between Maryland common law and constitutional principles may be a matter of emphasis. Maryland standards are more the product of the view that "confessions involuntarily given are inherently unreliable." *Scott v. State*, 61 Md.App. 599, 603, 487 A.2d 1204 (1985). In deciding the admissibility of confessions on constitutional grounds, the U.S. Supreme Court determines the extent to which the exercise of police power negates individual rights. Indeed, the Court of Appeals has stated that there is no doubt that the admissibility of confessions in a state criminal prosecution is tested by the same standard applied in federal prosecutions since 1897. *State v. Kidd*, 281 Md. 32, 34–35, 375 A.2d 1105 (1977). Cf., *Hillard v. State*, 286 Md. 145, 150, n. 1, 406 A.2d 415 (1979).

The guilt of the subject is to be posited as a fact. The interrogator should direct his comments toward the reasons why the subject committed the act, rather than ... asking the subject whether he did it.... The officers are instructed to minimize the moral seriousness of the offense, to cast the blame on the victim or on society. These tactics are designed to put the subject in a psychological state where his story is but an elaboration that he is guilty.

*Id.* at 450, 86 S.Ct. at 1615.

To remedy the coercive nature of this police conduct, the Supreme Court in *Miranda* created a set of now well-known procedures "to permit a full opportunity to exercise the privilege against self-incrimination" and to insure that the accused is "adequately and effectively apprised of his rights." *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624.

■ While the record reflects that the police technically apprised Young of his rights, we believe that the overall conduct of the police tended to negate the purpose of the *Miranda* safeguards. As we shall next discuss in our review of the totality of the circumstances of this case, by the time Young confessed, the police recital of "Miranda warnings" had become merely a matter of form without substance.

## 2. *Duration of Interrogations*

A concern for the duration of police interrogations is nothing new. In *Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), the United States Supreme Court considered the confession of a man who, while in custody, was almost continuously interrogated from 7:15 p.m. until 3:25 a.m. Although the case was decided under the Fourteenth Amendment, then Chief Justice Warren, writing for the Court, reflected upon the same concerns as those that form the basis of the Maryland common law.

The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrust-

worthiness. *It also turns on a deep-rooted feeling that the police must obey the law while enforcing the law; that in the end, life and liberty can be as much endangered from illegal methods to convict those thought to be criminals as from the actual criminals themselves.* (Emphasis added.)

*Id.* at 320–21, 79 S.Ct. at 1205–06.

In *Spano,* the accused was questioned for approximately eight straight hours during a period which was calculated, according to the Court, to accentuate the suspect's "slowly mounting fatigue."

The Court held that Spano's "will was overborne by official pressure, fatigue, and sympathy falsely aroused." *Id.* at 322, 79 S.Ct. at 1206. It concluded that the

police were not therefore merely trying to solve a crime, or even to absolve a suspect.... They were rather concerned primarily with securing a statement from [the] defendant on which they could convict him. The undeviating attempt of the officers to extract a confession from petitioner is therefore patent. When such intent is shown, this Court has held that the confession obtained must be examined with the most careful scrutiny, and has reversed a conviction on facts less compelling than these. [Citation omitted.] We hold that petitioner's conviction cannot stand under the Fourteenth Amendment.

*Id.* at 323–24, 79 S.Ct. at 1207.

Of course, *Spano* preceded *Miranda* and the consequent requirement that an accused be told of his right to remain silent and to have counsel present during questioning. As we have noted, however, the matter *sub judice* is a startling example of a situation in which the "Miranda warnings," in light of the overall police conduct, had little meaning to the accused.

On the other hand, in a case also decided prior to *Miranda,* the Maryland Court of Appeals stated that "lengthy interrogation in and of itself does not make a confession involuntary in the absence of a showing that such interroga-

tion, or other cause violative of the right to due process, had overpowered the will of the accused to resist making a statement that he would not otherwise have made." *Ralph v. State*, 226 Md. 480, 485, 174 A.2d 163 (1961).

From approximately noon on February 23, when he was arrested, until his confession at 10:30 a.m. on February 24, a period of 22½ hours, Young was almost continuously in an interrogation room at the Forestville Police Station. Also, for almost this entire period, he was subjected to a relay team of police interrogators. The opportunity for the "slowly mounting fatigue" noted more than twenty years ago in *Spano* appears throbbingly strong. Indeed, the eight hours of questioning in *Spano* pales in comparison to the 22½ hours of nearly continuous interrogation in the case of Young.

The duration of an accused's custody has been a concern of the courts of this state. Through the Maryland Constitution, the Maryland Rules of Procedure, and case law, certain additional restrictions on police conduct have evolved. We shall examine these restrictions in light of the totality of circumstances.

### 3. *Presentment to the District Court Commissioner*

In *Johnson v. State*, 282 Md. 314, 384 A.2d 709 (1978), the suspect presented himself to the Annapolis City Police Department at 3:15 p.m. At approximately 3:30 p.m., he was given his "Miranda warnings" and, as interrogation began, his physical condition led police officers to take him to a hospital. At 9:45 a.m. the next day, the officers recommenced interrogation. The appellant "all but confessed to his complicity" at 3:45 p.m. and was then taken before a commissioner at 4:00 p.m. In applying Maryland District Rule 723a, the Court of Appeals declared that "[i]n Maryland, as elsewhere, the purpose of the rule is to insure the accused will be promptly afforded the full panoply of safeguards provided at the initial appearance."[3] *Id.* at 321, 384

---

**3.** The current version of the Rule states in pertinent part:

A.2d 709. After reviewing the policy and application of this rule and similar ones in other states, the Court explained that "the protection of the right of an accused to prompt production before a judicial officer following arrest will be most effectively accomplished by a *per se* exclusionary rule." *Id.* at 328, 384 A.2d 709. The Court reasoned that the exclusionary rule was necessary to preserve the integrity of the criminal justice system and to assure a more even-handed application of the prompt presentment requirement. Furthermore, *Johnson* held that the State has the burden of showing that the delay was necessary under the circumstances of the particular case. *Id.* at 329, 384 A.2d 709.

As of July 1, 1981, however, *Johnson* lost much of its effect. On that date the Maryland legislature abrogated the *per se* exclusionary rule of *Johnson* by enacting the following statute:

(a) A confession may not be excluded from evidence solely because the defendant was not taken before a judicial officer after arrest within any time specified by the Maryland District Rules.

(b) Failure to strictly comply with the provisions of the Maryland District Rules ... is only one factor, among others, to be considered by the court in deciding the voluntariness and admissibility of a confession.

Courts Article § 10–912 Md.Ann.Code.

Clearly, the General Assembly directed the courts not to continue the *per se* exclusion of inculpatory statements made by an accused after a 24 hour period of police custody, prior to his appearance before a judicial officer of the

---

When the defendant is served with a copy of the charging document and warrant, the defendant shall be taken before a judicial officer of the District Court, or of the circuit court if the warrant so specified, *without unnecessary delay.* In the District Court the defendant's appearance shall be no later than 24 hours after service of the warrant, and in the circuit court it shall be no later than the next session of court after the date of service of the warrant. Md.Rule 4–212(f)(2) (emphasis supplied).

District Court. At the same time, the legislature also mandated that any delay in presentment before a judicial officer must be duly weighed in determining, as we do here, "the voluntariness and admissibility of a confession."

In the matter *sub judice,* Young remained at the police station for some twelve hours during which he was interrogated almost without interruption. Furthermore, throughout this period, a District Court Commissioner was available. This court has held that Rule 4–212 "while allowing for necessary delays in presenting a defendant before a judicial officer, does not countenance a delay for the principal purpose of obtaining a statement or a confession from the defendant." *Meyer v. State,* 43 Md.App. 427, 434, 406 A.2d 427 (1979). No other purpose appears for the police officers' delay in presenting Young to a judicial officer than to extract a confession from him.

Indeed, as we shall now discuss, the purpose behind the delay became even more evident after the presentment of Young to Commissioner Filmore. Despite the Commissioner's order to take Young to the Montgomery County Detention Center, the police returned Young to the interrogation room for further questioning.

### 4. *Police Conduct After Presentment*

As noted, the District Court Commissioner ordered the Prince George's County Police to transport Young to the Montgomery County Detention Center. The Commissioner testified that the order originated with the Administrative Judge of the District Court and was the result of evidence that the crime had been committed in Montgomery County rather than in Prince George's, where the police had recovered the body and the ring. The police did not comply with the order; instead, the appellant was once again handcuffed to a chain which was attached to the floor of an interrogation room in the Forestville police station in Prince George's County, where nine hours later he made his inculpatory statements.

In *Logan v. State,* 289 Md. 460, 425 A.2d 632 (1981), the Court of Appeals held that the prompt presentment of an accused before a commissioner was a waivable right of an accused. The dissent argued that the Maryland rule was a mandate to the police and, therefore, not a waivable right. Regardless, it is clear that once an accused is presented, a commissioner's order of commitment must be followed.

When commitment directives by District Court Commissioners are not followed by law enforcement personnel, the authority and function of these judicial officers are undermined, if not totally negated. To allow such improper conduct by the police would be to ignore not only common law principles but Maryland constitutional and statutory law which empower and entrust judicial functions to judicial officers. Md. Const. Art. IV § 41G; Courts Art. § 2-607; *see Smith v. State,* 305 Md. 489, 505 A.2d 511 (1986) for discussion of power granted to Commissioners of the District Court of Maryland.

On the basis of common law principles of voluntariness, and, under the totality of the circumstances, we conclude that Young was coerced through improper police conduct into making inculpatory statements. Therefore, we hold that the appellant's confessions were improperly obtained and should have been suppressed. Their admission into evidence was error.

## B. *Harmless Error*

■ Having found error, we must now decide whether it was harmless. The test is quite stringent:

> When an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated.

*Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976) quoted with approval in *Hillard,* 286 Md. at 155, 406 A.2d 415.

In the case *sub judice*, Young's statements made to his friend Hart were admitted without challenge. The confessions included in the testimony of Detectives Price and Ferriter, however, were, as we have said, erroneously admitted. We cannot say beyond a reasonable doubt that the latter testimony in no way influenced the verdict. *Cf. Lodowski*, 302 Md. at 723, 490 A.2d 1228. The admission of the confessions was prejudicial.

Although we have decided the principal issue before us, we now address, for the purpose of a new trial, the appellant's contention that the trial court erred in instructing the jury.

## II. *The Jury Instruction*

■ The appellant claims that the trial judge abused his discretion by refusing to include the following instruction:

A police officer's testimony should be considered by you just as any other evidence in this case, and in evaluating his credibility, you should use the same guidelines which you apply to the testimony of any other witness. In no event should you give any greater or lesser credence to the testimony of any witness merely because he is a police officer.

The appellant argues that under our holding in *Mumford v. State*, 19 Md.App. 640, 313 A.2d 563 (1974), the judge was compelled to use this instruction. In point of fact, *Mumford* dealt with a jury instruction which had direct significance in explaining crucial legal issues in that case. In the matter *sub judice*, however, the judge was asked to emphasize the jury's role in weighing the evidence and assessing the credibility of police officers in particular.

The trial judge instructed the jury on its role in considering the credibility of witnesses. The following is but a portion of that charge:

You are the sole judges of whether a witness should be believed, and in making this decision, you should apply your own common sense and everyday experiences in life. In determining whether a witness should be believed and

what weight to give the testimony of that witness, you should carefully judge all the testimony and evidence and circumstances under which each witness has testified.

We believe the record clearly shows that the trial judge sufficiently apprised the jury of its duties in its consideration of testimony and in evaluating witnesses. Thus, no specific instruction as to weighing the testimony of police officers was required. *See Leach v. State*, 47 Md.App. 611, 621–22, 425 A.2d 234 (1981).

JUDGMENT REVERSED; CASE REMANDED TO CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY MONTGOMERY COUNTY.